# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 25, 2011         Decided June 28, 2011

No. 09-5428

ANTHONY C. ROTH, ON BEHALF OF LESTER L. BOWER, JR.,
APPELLANT

v.

UNITED STATES DEPARTMENT OF JUSTICE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00822)

*Peter Buscemi* argued the cause for appellant. With him on the briefs were *Grace E. Speights* and *Anthony C. Roth*.

*Rhonda C. Fields*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen, Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: ROGERS, TATEL, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* KAVANAUGH.

TATEL, *Circuit Judge*: In this Freedom of Information Act case, a Texas death-row inmate seeks information from the Federal Bureau of Investigation that he alleges might corroborate his claim that four other men actually committed the quadruple homicide for which he was convicted. The FBI provided a so-called *Glomar* response, neither confirming nor denying whether it has records regarding three of the four men (the fourth has died). The FBI defends this response under FOIA Exemption 7(C), which permits agencies to withhold information contained in law-enforcement records to protect against unwarranted invasions of personal privacy. Applying the Supreme Court's decision in *National Archives & Records Administration v. Favish*, we conclude that (1) the public has an interest in knowing whether the federal government is withholding information that could corroborate a death-row inmate's claim of innocence, and (2) that interest outweighs the three men's privacy interest in having the FBI not disclose whether it possesses any information linking them to the murders. We thus reverse the district court's approval of the FBI's *Glomar* response. And with only minor exceptions, we affirm the district court's rejection of appellant's other arguments.

**I.**

Appellant Anthony Roth represents Lester Leroy Bower, Jr., who is on death row in Texas for four murders committed over a quarter century ago. In January 2008, Roth filed FOIA requests with the FBI and the Executive Office for United States Attorneys seeking information concerning the FBI's investigation of the murders and about four individuals who Bower claims are the real killers. Although Bower was prosecuted by the state of Texas, the FBI, believing that the

murders implicated various federal laws, jointly investigated the crime with local authorities. An Assistant United States Attorney served as a member of the prosecution team.

"FOIA requires every federal agency, upon request, to make 'promptly available to any person' any 'records' so long as the request 'reasonably describes such records.'" *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003) (quoting 5 U.S.C. § 552(a)(3)(A)). Although the Act "reflects a general philosophy of full agency disclosure," it "provides for several exemptions under which an agency may deny disclosure of the requested records." *Id.* (internal quotation marks omitted). The agency "bears the burden of establishing the applicability" of any exemption it invokes, and "even if [the] agency establishes an exemption, it must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)." *Id.* at 57–58; *see also* 5 U.S.C. § 552(a)(4)(B), (b). In this case, we must consider whether the FBI properly withheld information responsive to Roth's FOIA requests under three statutory exemptions: Exemption 6, covering "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy"; Exemption 7(C), covering "records or information compiled for law enforcement purposes," the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy"; and Exemption 7(D), covering (among other things) records or information "compiled by criminal law enforcement authorit[ies] in the course of a criminal investigation" that "could reasonably be expected to disclose the identity of a confidential source" or "information furnished by" such a source. 5 U.S.C. § 552(b)(6), (7)(C)–(D).

Understanding the FOIA issues in this case requires fairly detailed knowledge of the facts underlying Bower's capital-murder convictions. On the evening of October 8, 1983, law enforcement authorities discovered the bodies of Bobby Glen Tate, Ronald Mays, Philip Good, and Jerry Mack Brown at Tate's ranch near Sherman, Texas. *Bower v. State*, 769 S.W.2d 887, 889–90 (Tex. Crim. App. 1989), *overruled in part by Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991). From the victims' bodies, investigators retrieved eleven .22-caliber, subsonic, hollow-point bullets manufactured by Julio Fiocchi. *Id.* at 890. Tests run on those bullets and their shell casings indicated that "the shots were fired from either an AR-7 .22 caliber rifle, a Ruger .22 caliber semi-automatic pistol, or a High Standard .22 caliber semi-automatic pistol." *Id.* Markings on the bullets and other forensic evidence revealed that a silencer had been used. *Id.*

The victims' bodies were found in a hangar where Tate stored ultralight aircraft. *Id.* at 889. Although an ultralight owned by another person was in the hangar when the bodies were discovered, Tate's ultralight was missing. *Id.* at 889–90. Before the shootings, Philip Good had been assisting Tate in his effort to sell his ultralight. *Id.* at 889. Good's widow testified that shortly before the murders, Good had told her that he thought he had found a buyer and that the buyer was planning to pick up Tate's ultralight on October 8. *Id.*

Records showed that Bower made three calls to the Good residence in the days leading up to the murders. *Id.* at 891. Although Bower admitted calling to inquire about an advertisement Good had placed in *Glider Rider* magazine, he told FBI investigators that "he had never bought an ultra light, that he had not been in Sherman on the day of the murders, that he had not met Philip Good on the day of the murders and had never met him in person, that he did not know where the

missing ultra light was, and that he had never seen the missing ultra light." *Id.* at 891–92. Bower also admitted to owning a number of firearms but denied owning a .22-caliber handgun. *Id.* at 891. At the time, Bower was licensed to sell firearms and ammunition. *Id.* at 892.

Searching Bower's home, law enforcement officers found, among other things, an instruction manual for a Ruger .22-caliber pistol; information on silencers; a form letter from Catawba Enterprises, a company that dealt primarily in silencer parts; and a record of the firearms that Bower had acquired and sold, which showed that he had purchased a Ruger RST-6 .22-caliber pistol on February 12, 1982, and then sold it to himself on March 1, 1982. *Id.* In Bower's garage, authorities discovered two ultralight tires and rims with the name "Tate" scratched into each rim. *Id.* They also seized ultralight tubing that later tests revealed bore a fingerprint from one of the murder victims. *Id.* In addition, authorities discovered a pair of rubber boots and a blue nylon bag, both of which were stained with blood. *Id.* at 892–93.

The investigation also revealed that the .22-caliber subsonic Julio Fiocchi bullets used in the murders were "specialty item[s]" not sold "over the counter" at sporting-goods stores. *Id.* at 893. Records of Bingham Limited, the sole United States distributor of Julio Fiocchi ammunition, indicated that the company "had shipped three boxes of Fiocchi .22 long rifle sub-sonic hollow point ammunition to [Bower] on February 12, 1982 and five more boxes on December 10, 1982." *Id.*

Bower was convicted of the four murders and sentenced to death in April 1984. After Bower's efforts to overturn his sentence and conviction on direct appeal and through a state habeas petition failed, he filed a federal habeas petition under

28 U.S.C. § 2254 in the U.S. District Court for the Eastern District of Texas. *See Bower v. Quarterman*, 497 F.3d 459, 465–66 (5th Cir. 2007). Among other things, Bower argued that his trial attorney was ineffective and that the government had withheld material, exculpatory evidence in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In June 2000, the district court held an evidentiary hearing on Bower's claim of ineffective assistance of counsel at which Bower testified—something he had not done at his criminal trial. *Bower v. Director, Tex. Dep't of Crim. Justice–Inst'l Div.*, No. 1:92cv182, slip op. at 1, 25, 28–29 (E.D. Tex. Sept. 6, 2002) ("*Bower Habeas Op.*"). Bower explained that he contacted Philip Good in the fall of 1983 because he was interested in purchasing an ultralight airplane. *Id.* at 25. Good then introduced Bower to Tate, who wanted to sell his ultralight. *Id.* at 25–27. According to Bower, he met Good and Tate at Tate's ranch around 3:00 p.m. on October 8. *Id.* at 26. After agreeing to buy the ultralight, Bower gave Tate $3000 and wrote an IOU for $1500 on a business card. *Id.* at 26–27. Bower testified that he then left the ranch with the ultralight at approximately 4:00 p.m. *Id.* at 27.

Bower's testimony in the habeas proceedings contradicted his earlier statements to FBI investigators—that he had not gone to Sherman to meet Good and had not purchased Tate's ultralight. *Bower*, 769 S.W.2d at 891–92. Nevertheless, Roth—Bower's attorney and appellant in this case—contends that "[c]ritical components of . . . Bower's account are corroborated" by evidence in the prosecution's investigative files. Appellant's Opening Br. 6. Specifically, he points to evidence that soon after the shootings, Tate's widow called the local sheriff's office to ask whether "$3,000 or a large check" had been found on Tate's body, as well as to evidence that the medical examiner discovered a single

business card, later lost by law enforcement officials, in Tate's shirt pocket. *Id.* at 6–7. Furthermore, and central to this case, two witnesses have come forward since Bower's criminal trial and provided sworn statements indicating that the murders were committed not by Bower, but instead by four Oklahoma drug dealers: Brett ("Bear") Leckie, Chestley ("Ches") Galen Gordon, Lynn Langford, and Robert ("Rocky") T. Ford. *See id.* at 7–10; Compl. ¶ 12. The first witness, Langford's girlfriend at the time of the murders, testified at the Eastern District of Texas habeas hearing that she had driven with Langford from Hillsboro, Texas, to Lexington, Oklahoma, the day after the shootings. *Bower Habeas Op.*, No. 1:92cv182, slip op. at 23. According to the ex-girlfriend, when the couple passed through Sherman, Langford "got down low in the seat and stated that he had killed some people the day before in Sherman in a drug deal that went bad." *Id.* About a week later, the witness testified, "she overheard [Langford] and another man named 'Ches' bragging about the killings and how they had stolen an ultralight." *Id.* According to Roth, the second witness, Leckie's widow, has stated in a sworn affidavit that she overheard various conversations from late 1983 through 1985 in which "her husband and his friends, including Ches and Lynn, talk[ed] about four men who were shot at an airplane hangar in Sherman, Texas over a drug deal that went bad." Appellant's Opening Br. 9.

After the district court denied Bower's habeas petition, Bower filed a motion to alter or amend the judgment, arguing (among other things) that the court had failed to fully address his *Brady* claim. In particular, Bower contended that information produced by the FBI in response to FOIA requests filed by his habeas attorneys demonstrated that prosecutors in his criminal case had withheld material, exculpatory evidence. Bower's habeas attorneys first filed a

FOIA request with the FBI in 1989. The FBI responded in 1990 by releasing approximately 850 pages of documents, many "extensively redacted." Roth Decl. ¶ 5. In November 1999, Bower's attorneys filed another request, which they subsequently asked the FBI to expedite after the Eastern District of Texas granted Bower's request for an evidentiary hearing. But the FBI failed to release any responsive materials until January 31, 2001—after the district court had concluded its evidentiary hearing but before it had issued its decision denying Bower's habeas petition. The FBI's 2001 FOIA response included approximately 1500 pages, far more than the 850 released in 1990, and many of the previously released documents reflected fewer redactions. According to Roth, the FBI's 2001 FOIA response revealed five types of material, exculpatory evidence not previously made available to Bower's trial or habeas counsel:

1. Tate was involved in illegal gambling—in particular, "cock fighting"—and drug dealing and may have been killed because "he had used the proceeds from drug sales to pay off his gambling debts instead of repaying his drug source." Appellant's Opening Br. 13.

2. An FBI agent was able to find and purchase Julio Fiocchi .22-caliber subsonic ammunition at a Dallas gun show, thus undermining the prosecution's portrayal of the ammunition as "rare," "unusual," "exotic," and "unique." Appellant's Reply Br. 19–20 (internal quotation marks omitted).

3. Although FBI agents "had collected samples of [Fiocchi] ammunition from the same lot number as had been sold to . . . Bower . . . in order to compare the lead bullets' 'elemental analysis' with the bullets taken from the victims' bodies," the Assistant United

States Attorney working on the case had a "discussion" with FBI agents on April 11, 1984, following which the FBI terminated its effort before it had completed its analysis of the bullets. Appellant's Opening Br. 14.

4. Contrary to the prosecution's claim that Fiocchi .22-caliber subsonic ammunition has but one use—killing people—"[n]otes of FBI interviews with persons who had purchased [the ammunition] disclosed that the ammunition was used" for various legitimate purposes, including reducing noise in indoor shooting ranges, teaching shooting to people who do not like loud noises, and eliminating "varmint[s] in a populated area without alarming the entire neighborhood." *Id.* at 14–15.

5. Catawba silencer tubes for Ruger pistols "were readily available from many sources," thus "undermin[ing] the prosecution's effort to ascribe sinister significance to the fact that . . . Bower had once placed an order with Catawba." *Id.* at 15.

In ruling on Bower's motion to alter or amend the judgment, the district court concluded that Bower had failed to show that his *Brady* rights had been violated. The court observed that Bower's trial attorney admitted that he was aware of rumors that "some of the victims were engaged in nefarious activities such as cock fighting and drug dealing." *Bower v. Director, Tex. Dep't of Crim. Justice–Inst'l Div.*, No. 92cv182, slip op. at 14–15 (E.D. Tex. June 13, 2003). As a result, the district court concluded, the FBI's failure to disclose the evidence its agents collected regarding Tate's illicit activities "constitute[d] harmless error." *Id.* at 15. The district court also determined that (1) the fact that the

ammunition used to commit the murders was available at gun shows did "not necessarily mean that it [was] not rare and/or exotic"; (2) the FBI's failure to disclose that its investigation revealed that subsonic ammunition could be used for legitimate purposes was "harmless error" because "Bower's counsel testified that he did not find Bower's purchase of subsonic ammunition suspicious," thus indicating that he "was able to think of non-criminal uses for the ammunition"; and (3) evidence that "other individuals were able, after being requested by the F.B.I., to obtain silencer tubes through mail order does not establish that many other people in [the Sherman area] actually owned such weaponry at the time the killings occurred." *Id.* at 13–14. The district court never discussed the evidence indicating that just as Bower's trial was beginning, the FBI called off a planned comparison between the bullets extracted from the victims' bodies and bullets from the same lot number as those purchased by Bower.

Although the district court denied Bower's habeas petition, it granted Bower a certificate of appealability on his claim of ineffective assistance of counsel and his *Brady* claim. *See* 28 U.S.C. § 2253(c) (providing that a state prisoner may not appeal a district court's denial of his habeas petition without first obtaining a "certificate of appealability," which may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right"). The Fifth Circuit affirmed. With respect to Bower's *Brady* claim, the Fifth Circuit determined that "[n]one of the evidence argued to support . . . [the] claim, in the form of over 2,000 pages of FBI files, is exculpatory; that is, none of the evidence is sufficient to 'undermine confidence in the jury's verdict.'" *Bower*, 497 F.3d at 477 (quoting *Spence v. Johnson*, 80 F.3d 989, 999 (5th Cir. 1996)). The court emphasized that the FBI documents contained no "evidence linking the murders to the

victims' alleged illegal activity." *Id.* Instead, the documents merely summarized investigative theories of which Bower's counsel "was aware . . . but didn't extensively pursue himself." *Id.* The court also observed that the documents' references to individuals who had purchased Fiocchi ammunition for legitimate purposes did not "directly contradict the state's evidence that the ammunition was not widely available." *Id.* Ultimately, the court concluded that although the documents disclosed in the FBI's 2001 FOIA response "provid[ed] some support for an alternative theory of the crime, a theory which Bower's counsel was well aware of, none of the FBI files contradict[ed] the circumstantial evidence used by the state to convict Bower." *Id.* Accordingly, the court concluded that the withheld evidence was not material and thus that the FBI's failure to disclose the evidence to Bower's trial attorney did not violate *Brady*. *Id.*

A Texas state court stayed Bower's execution in July 2008 and subsequently granted his motion for DNA testing of certain crime scene evidence. Those state court proceedings remain pending, and no execution date is currently scheduled.

Roth submitted the FOIA requests at issue in this case in January 2008. Since the parties no longer dispute any issues regarding the request Roth addressed to the Executive Office for United States Attorneys, we shall focus exclusively on Roth's two requests for documents from the FBI. *Roth v. U.S. Dep't of Justice*, 656 F. Supp. 2d 153, 159 n.3 (D.D.C. 2009). In one request Roth sought "any and all records" relating to Jerry Buckner, Bower's trial attorney, and the four individuals who Bower alleges were the real killers—Leckie, Gordon, Langford, and Ford. The second request sought documents from particular FBI files containing information regarding its investigation of the 1983 murders. *See id.* at 157 n.2.

The FBI gave a "*Glomar* response" to Roth's first request. *Id.* at 166. In such a response the government neither confirms nor denies the existence of the requested records. The response is named for the *Hughes Glomar Explorer*, a ship used in a classified Central Intelligence Agency project "to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts." *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981); *see also Military Audit Project v. Casey*, 656 F.2d 724, 728–29 (D.C. Cir. 1981); Matthew Aid, *Project Azorian: The CIA's Declassified History of the* Glomar Explorer, Nat'l Security Archive, http://www.gwu.edu/~nsarchiv/nukevault/ebb305/index.htm (Feb. 12, 2010) (providing a link to a partially declassified article about the *Hughes Glomar Explorer* from the fall 1985 edition of the CIA's in-house journal *Studies in Intelligence*). Responding to a journalist's FOIA request for records regarding the CIA's alleged efforts to convince media outlets not to make public what they had learned about the *Hughes Glomar Explorer*, the Agency refused to either confirm or deny whether it had such records. *See Phillippi v. CIA*, 546 F.2d 1009, 1011–12 (D.C. Cir. 1976). Thus the term "*Glomar* response" entered the FOIA lexicon. In the case before us, the FBI refused to confirm or deny whether its files contained information regarding the five individuals named in Roth's request without proof that they were either dead or had consented to the release of the information. *Roth*, 656 F. Supp. 2d at 158. In support of this *Glomar* response, the FBI relied on FOIA Exemptions 6 and 7(C), which, as explained above, exempt certain government documents from disclosure to protect the privacy interests of third parties. *See* 5 U.S.C. § 552(b)(6), (7)(C). The FBI later processed Roth's request regarding Leckie after Roth provided evidence that Leckie had died, and Roth has dropped his request for information

regarding Jerry Buckner. *Roth*, 656 F. Supp. 2d at 158. Thus, only the FBI's *Glomar* responses regarding Gordon, Langford, and Ford remain at issue. *Id.*

With respect to Roth's second FOIA request—for records contained in particular FBI files—only 62 pages of documents are still at issue, 36 of which the FBI has withheld in their entirety and 26 of which have been released but contain redactions that Roth claims the FBI has failed to adequately justify. According to the FBI, it has properly withheld information contained in these documents under FOIA Exemptions 6 and 7(C), as well as Exemption 7(D), which, as we have explained, protects from disclosure criminal-investigative records that if produced "could reasonably be expected to disclose the identity of a confidential source" or "information furnished by" such a source. 5 U.S.C. § 552(b)(7)(D).

The FBI provided the district court with a *Vaughn* index and then a supplemental *Vaughn* index that described the withheld information and explained its reasons for refusing to disclose it. *See Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973) (requiring agencies resisting FOIA disclosure to index the information they are withholding and to provide non-conclusory justifications for doing so). The district court reviewed *in camera* the disputed documents that were responsive to Roth's second FOIA request, and those documents have been submitted for our *in camera* review as well. *See* 5 U.S.C. § 552(a)(4)(B) (permitting a district court in a FOIA case to examine withheld documents *in camera*). Importantly, since the FBI provided a *Glomar* response to Roth's FOIA request for information concerning Gordon, Langford, and Ford, we have no way of knowing whether the FBI has information linking the men to the 1983 murders in files other than those listed in Roth's second FOIA request. In

other words, we do not know whether the documents the FBI produced for *in camera* review are the only documents in the FBI's possession that might implicate Gordon, Langford, or Ford.

Ruling on the FBI's motion for summary judgment, the district court determined that the *Glomar* response was proper and that, with only a few exceptions, the FBI's withholding of information from the documents submitted for *in camera* review found support in one or more FOIA exemptions. *See Roth*, 656 F. Supp. 2d at 159–67. On appeal, Roth challenges the district court's conclusions (1) that he had failed to identify a sufficiently compelling public interest to justify the disclosure of information that might intrude on third-party privacy interests protected by Exemptions 6 and 7(C), and (2) that the government had satisfied its burden of proving that the information withheld under Exemption 7(D) was furnished by or could reasonably be expected to disclose the identity of a confidential source. Our review of the district court's summary judgment decision is *de novo*. *See Juarez v. Dep't of Justice*, 518 F.3d 54, 58 (D.C. Cir. 2008).

## II.

In providing its *Glomar* response to Roth's request for information regarding Gordon, Langford, and Ford, the FBI relied on Exemptions 6 and 7(C), arguing that the mere act of confirming whether it even has records regarding these men would tend to associate them with criminal activity, thus constituting an unwarranted invasion of their privacy. The FBI also invoked these exemptions to justify withholding information contained in the documents submitted for *in camera* review. In particular, it sought to protect the privacy interests of "local law enforcement employees; third parties merely mentioned in FBI records; state, local, and non-FBI federal government personnel; third parties of investigative

interest; third parties who provided information to the FBI; and commercial institution personnel [i.e., individuals working for retailers, manufacturers, and other commercial entities]." *Roth*, 656 F. Supp. 2d at 161–62 (footnotes omitted).

Exemption 7(C), which requires the government to prove only that disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy," is "somewhat broader" than Exemption 6, which requires proof of a "clearly unwarranted invasion of personal privacy." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989). If the information withheld here was "compiled for law enforcement purposes," thus implicating Exemption 7(C), then we would have no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C).

Although not disputing that the information contained in the documents submitted for *in camera* review was "compiled for law enforcement purposes," Roth contends that the FBI has failed to demonstrate that any undisclosed records it might have regarding Gordon, Langford, or Ford were compiled for such purposes. As Roth correctly notes, "FBI records are not law enforcement records [under FOIA] simply by virtue of the function that the FBI serves." *Vymetalik v. FBI*, 785 F.2d 1090, 1095 (D.C. Cir. 1986). For example, records the FBI compiles regarding a job applicant may fall outside the scope of Exemption 7(C). *See id.* at 1096 (distinguishing "between records generated by a law enforcement investigation and those generated by an employment investigation"). Furthermore, Exemption 7(C) would have no applicability to information obtained in an illicit intelligence-gathering operation lacking any rational

nexus to the FBI's law-enforcement duties. *See Pratt v. Webster*, 673 F.2d 408, 419–21 (D.C. Cir. 1982). In this case, however, there is no reason to believe that the FBI would have compiled information regarding Gordon, Langford, or Ford outside the context of a legitimate law-enforcement investigation. Accordingly, the FBI interpreted Roth's request for information regarding these men "as a request for criminal investigative information about . . . third parties." Second Hardy Decl. ¶ 24. As the FBI points out, by stating that "he is seeking 'documents relating to the persons that have been identified as the real killers,' " Roth has essentially confirmed that the information he seeks was likely compiled for law-enforcement purposes. *Id.* (quoting Pl.'s Mem. in Opp'n to Mot. for Summ. J. 7). Like the district court, we thus conclude that the FBI has satisfied its threshold burden of showing that all documents responsive to Roth's requests, including any that might relate to Gordon, Langford, or Ford, were compiled for law enforcement purposes. *Roth*, 656 F. Supp. 2d at 161 n.6, 166. As a result, we shall focus on Exemption 7(C) rather than Exemption 6 since it is the broader of the two.

To determine whether disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy" for purposes of Exemption 7(C), we must "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992). We have no doubt that Roth's FOIA requests implicate significant privacy interests. As we have "long recognized," the " 'mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation.' " *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 666 (D.C. Cir. 2003) (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990)). We have thus held that not only the targets

of law-enforcement investigations, but also "witnesses, informants, and . . . investigating agents" have a "substantial interest" in ensuring that their relationship to the investigations "remains secret." *Id.* (internal quotation marks omitted); *see also SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1205 (D.C. Cir. 1991).

Roth argues that the privacy interests implicated by his FOIA requests are attenuated for two reasons: (1) more than a quarter century has passed since the 1983 murders, and (2) since Gordon, Langford, and Ford have significant criminal records, they would likely suffer less embarrassment and reputational harm from being associated with the FBI's investigation of the murders than would ordinary, law-abiding citizens. Especially given the particularly heinous nature of the 1983 murders, however, neither of these arguments is persuasive. If, as we held in *Schrecker v. Department of Justice*, 349 F.3d at 666, the passage of approximately a half century did not "materially diminish" individuals' privacy interests in not being associated with McCarthy-era investigations, then certainly individuals continue to have a significant interest in not being associated with an investigation into a brutal quadruple homicide committed less than thirty years ago. Furthermore, Roth's argument that the privacy interests of Gordon, Langford, and Ford are diminished by their criminal records runs contrary to the Supreme Court's recognition in *Department of Justice v. Reporters Committee for Freedom of the Press* that even convicted criminals have a substantial privacy interest in their "rap sheets." 489 U.S. at 762–71, 776–80; *see also McNamera v. U.S. Dep't of Justice*, 974 F. Supp. 946, 959 (W.D. Tex. 1997) (noting that "the court was unable to find any case holding that a prisoner has fewer privacy rights in disclosure of private information, other than for information made public during the criminal proceedings, than the rest of

us"). But even if individuals with criminal records might in some cases have a reduced privacy interest in not being associated with criminal activity because their reputations have already been tarnished by their previous crimes, this is hardly such a case. Most of Gordon, Langford, and Ford's convictions are for firearms and drug offenses. Sikes Decl. ¶¶ 4–6. Although Gordon pleaded guilty to assault with a deadly weapon, *id.* ¶ 4(b), Roth has presented no evidence that any of the three men has previously been accused of murder, much less convicted of the crime. For this reason, being associated with a quadruple homicide would likely cause them precisely the type of embarrassment and reputational harm that Exemption 7(C) is designed to guard against.

Having determined that Roth's FOIA requests implicate substantial privacy interests protected by Exemption 7(C), we turn to the central question in this case: precisely what public interest would be furthered through disclosure? Roth bears the burden of showing (1) that "the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and (2) that the information he seeks "is likely to advance that interest." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). According to Roth, disclosure will further the public interest in two ways. First, it will advance the public's interest in knowing whether the federal government complied with its *Brady* obligation to disclose material, exculpatory information to Bower's trial counsel. Even though Bower was prosecuted in a Texas state court rather than a federal court, the Department of Justice, appellee in this case, does not dispute that the Assistant United States Attorney who participated in Bower's capital murder trial had a duty not only to learn of any *Brady* material in the FBI's possession, but also to disclose it to Bower's trial counsel. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty

to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). Second, and more generally, Roth asserts disclosure will further the public's interest in knowing whether the FBI is withholding information that could corroborate a death-row inmate's claim of innocence. Although this second public interest was not mentioned in the district court's decision and receives scant attention in the government's appellate brief, *see* Appellee's Br. 23–24 (suggesting that Roth failed to articulate the second public interest at the district-court level), we believe that Roth adequately raised the issue both in the district court and here. In the district court, Roth argued that the "[p]roduction of the documents at issue [in this case] could serve the substantial public interest in avoiding the execution of an innocent man." Pl.'s Mem. in Opp'n to Mot. for Summ. J. 1; *see also id.* at 26 ("[T]he public interest in knowing whether the federal government prosecuted and obtained the death penalty against the proper person outweighs privacy interests in this twenty-five year old case." (bolding and underlining omitted and capitalization of words altered)). And on appeal, Roth alleges that the "FBI continues to withhold and redact decades-old documents that may help to prevent the execution of an innocent man" and asserts, "The public has a powerful interest in understanding the procedures and governmental actions that lead to capital sentences and in ensuring that potentially exculpatory evidence is disclosed before a person is executed." Appellant's Opening Br. 17, 35; *see also id.* at 20 ("The documents requested by Roth touch upon the core objective of FOIA—to shed light on what the government is up to—at a time in which the public interest in the death penalty in Texas, the State's potential for executing innocent persons, and the possible withholding of exculpatory material is at a high level.").

We pause to emphasize the distinction between the two types of public interest claimed by Roth. Since the right to the disclosure of material, exculpatory evidence recognized in *Brady* protects a defendant's right to a fair trial, *see Brady*, 373 U.S. at 87, the determination of whether information is "material" for purposes of *Brady* focuses on how the information relates to other information known at the time of trial, *see Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). It is possible, however, that evidence in the government's possession before trial will appear material only in light of evidence developed after trial. Consider this very case. Although the Fifth Circuit found it unlikely that disclosure of the materials produced in the FBI's 2001 FOIA response would have made a difference in Bower's 1984 trial, *see Bower*, 497 F.3d at 476–77, since that trial, witnesses have come forward who have implicated others in the 1983 murders. The combination of those statements and the materials contained in the FBI's 2001 FOIA response could well lead a reasonable person to doubt Bower's guilt. In other words, the documents released in 2001 may appear material only in light of the witnesses' post-trial statements. The Supreme Court, however, has indicated that *Brady* generally "is the wrong framework" for evaluating the government's post-trial disclosure obligations. *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2320 (2009); *see also Skinner v. Switzer*, 131 S. Ct. 1289, 1300 (2011) ("*Brady* announced a constitutional requirement addressed first and foremost to the prosecution's conduct pretrial."). Thus, the public's interest in knowing whether the federal government complied with its *Brady* obligations at the time of Bower's trial is narrower than and does not fully encompass the public's more general interest in

knowing whether the FBI is withholding information that could corroborate Bower's claim of innocence.

Furthermore, we have no doubt that the second, non-*Brady*-related public interest identified by Roth is substantial. In recent years, high-profile exonerations of death-row inmates have generated considerable public interest in the potential innocence of individuals sentenced to death. *See* Death Penalty Info. Ctr., *The Innocence List*, http://www.deathpenaltyinfo.org/innocence-list-those-freed-death-row (last visited June 16, 2011) (listing 138 death-row inmates who, since 1973, have been pardoned based on new evidence of innocence or have had their convictions overturned and either were not retried or were acquitted at retrial). This interest has manifested itself in several media, including newspaper articles, editorials, journalistic exposés, novels, and plays. *See, e.g.*, Jessica Blank & Erik Jensen, *The Exonerated* (2004); John Grisham, *The Confession* (2010); David Grann, *Trial by Fire: Did Texas Execute an Innocent Man?*, New Yorker, Sept. 7, 2009, at 42; *see also* Editorial, *The Death Penalty: It's Time for Capital Punishment To Become Texas History*, Houston Chron., Jan. 2, 2011, at B11 (calling for the abolition of the death penalty in Texas because "accumulating evidence indicates that the current application of the death penalty in [the state] involves an unacceptably high risk of killing innocent people"); Tim Madigan, *Witness Says Condemned Man Isn't Responsible for 1983 Slayings*, Star-Telegram (Ft. Worth, Tex.), June 29, 2008, at 1B (discussing Bower's effort to prove his innocence).

The government insists that "Bower's status as an individual facing capital punishment should not affect" our analysis under Exemption 7(C). Appellee's Br. 37. We disagree. The fact that Bower has been sentenced to the ultimate punishment strengthens the public's interest in

knowing whether the FBI's files contain information that could corroborate his claim of innocence. The case on which the government relies, *Loving v. Department of Defense*, 550 F.3d 32 (D.C. Cir. 2008), says nothing to the contrary. True, we said in *Loving*—which dealt with FOIA Exemption 5, not Exemption 7(C)—that the fact that the FOIA requester was a capital prisoner had "no bearing on the merits" of his request. *Id.* at 39 (internal quotation marks omitted); *see also* 5 U.S.C. § 552(b)(5) (providing that FOIA's disclosure requirement "does not apply to . . . inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency"). But this statement merely reiterated what the Supreme Court said in *Reporters Committee*: "Except for cases in which the objection to disclosure is based on a claim of privilege and the person requesting disclosure is the party protected by the privilege, the identity of the requesting party has no bearing on the merits of his or her FOIA request." *Reporters Comm.*, 489 U.S. at 771; *see also Loving*, 550 F.3d at 39 (quoting *Reporters Comm.*). This principle requires nothing more than that our legal analysis remain unaffected by the fact that this case was brought by a lawyer representing Bower instead of by a party with no relation to Bower, such as a reporter, academic, or individual citizen simply interested in Bower's case. As we weigh the public interest at stake in this case, neither *Loving* nor *Reporters Committee* bars us from considering the fact that Bower has been sentenced to death.

Having concluded that the second type of public interest is both distinct from the first and substantial, we must now consider whether either of the public interests identified by Roth requires the FBI to disclose information withheld under Exemption 7(C). We can easily dispose of Roth's challenge to the FBI's withholding of information from the documents that we and the district court reviewed *in camera*. Turning first to

the public's interest in revealing *Brady* violations, we highly doubt that any of the information withheld under Exemption 7(C) qualifies as *Brady* material. But even if reasonable minds could disagree on this point, we believe that the privacy interests of the individuals named in the documents outweigh any public interest in disclosure. At most, the documents contain information that one might consider to lie near the hazy borderline separating material from immaterial evidence. *See Kyles*, 514 U.S. at 435 (noting that in determining whether withheld evidence is "material" for purposes of *Brady*, a court should consider whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," an inquiry that is difficult for us to undertake here since Roth has failed to produce the transcripts of Bower's trial). Although Bower certainly has an intense personal interest in obtaining whatever information might bolster the *Brady* claims he is presenting in his collateral attacks on his conviction, Bower's personal stake in the release of the requested information is "irrelevant" to the balancing of public and third-party privacy interests required by Exemption 7(C). *Mays v. DEA*, 234 F.3d 1324, 1327 (D.C. Cir. 2000). FOIA is not a substitute for discovery in criminal cases or in habeas proceedings. Instead, its purpose is to protect "the citizens' right to be informed about 'what their government is up to.' " *Reporters Comm.*, 489 U.S. at 773 (quoting *EPA v. Mink*, 410 U.S. 73, 105 (1973) (Douglas, J., dissenting)). Although the public might well have a significant interest in knowing whether the federal government engaged in blatant *Brady* violations in a capital case, we are confident that none of the documents we have reviewed *in camera* reveals any such egregious government misconduct. *Cf. Boyd v. Crim. Div. of the U.S. Dep't of Justice*, 475 F.3d 381, 387–88 (D.C. Cir. 2007) (stating, in a FOIA case in which a defendant convicted of non-capital drug

and weapons offenses sought records that he claimed might reveal "*Brady*-related misconduct," that a "single instance of a *Brady* violation . . . would not suffice to show a pattern of government wrongdoing as could overcome the significant privacy interest at stake").

With respect to the second public interest identified by Roth—the public's interest in knowing whether the FBI is withholding information that could help exonerate a potentially innocent death-row inmate—our *in camera* review also revealed no information withheld under Exemption 7(C) that would substantially corroborate Bower's claim that Leckie, Gordon, Langford, and Ford were the true killers. True, as Roth argues, "it is entirely possible that the importance of the withheld documents would only be clear to one who has extensive knowledge of the Bower trial, sentencing, and habeas proceedings." Appellant's Opening Br. 39. But we can only weigh the public and private interests at stake based on the record before us, and it was Roth's responsibility to provide the district court and this Court with the information necessary to perform that balancing. Based on the information presented to us, we conclude that the FBI acted appropriately in redacting information under Exemption 7(C) from the *in camera* documents.

The FBI's *Glomar* response to Roth's request for information regarding Gordon, Langford, and Ford presents more difficult issues. Since the FBI has refused to confirm or deny whether it has information regarding these men, we have no way of knowing whether any information it might have would qualify as *Brady* material or could corroborate Bower's claim of innocence. Because *Glomar* responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for

withholding that information, *see Vaughn*, 484 F.2d at 826–28, they are permitted only when confirming or denying the existence of records would itself " 'cause harm cognizable under an FOIA exception,' " *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)). Thus, in determining whether the FBI properly provided a *Glomar* response, we must consider whether "the fact of the existence or nonexistence of [the requested] records falls within a FOIA exemption." *Id.* Since merely acknowledging that the FBI has information regarding Gordon, Langford, and Ford would tend to associate them with criminal activity, thus impinging on their privacy, the FBI's *Glomar* response, absent a countervailing public interest in disclosure, was appropriate under Exemption 7(C). Where, as here, the asserted public interest is the revealing of government misconduct, the Supreme Court's decision in *National Archives & Records Administration v. Favish* requires that the FOIA requester "establish more than a bare suspicion" of misconduct. 541 U.S. at 174. Instead, "the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Id.* Only if Roth satisfies this threshold requirement will we proceed to balance Gordon, Langford, and Ford's interest in having the FBI neither confirm nor deny the existence of records relating to them against the public interest at stake. *See Boyd*, 475 F.3d at 387.

We begin with the first public interest identified by Roth—the interest in knowing whether the federal government violated its *Brady* obligations at the time of Bower's trial. As evidence that the federal government might well have failed to comply with *Brady*, Roth points to information that he claims was disclosed for the first time in the FBI's 2001 FOIA response. As explained above, the

documents produced in 2001 indicated that one of the murder victims was involved in illegal gambling and drug dealing; that Julio Fiocchi .22-caliber subsonic ammunition could be purchased at gun shows and has legitimate uses; that just as Bower's trial was beginning the FBI decided against going ahead with a planned comparison between the bullets taken from the victims' bodies and bullets from the same lot number as Bower had purchased; and that Catawba silencer tubes are readily available from many sources.

For its part, the government insists that Roth cannot rely on the documents produced in 2001 to support his *Brady* argument because in the district court he failed to offer any proof that those documents were not provided to Bower's trial counsel in 1984. We agree with Roth that this argument is "silly." Appellant's Reply Br. 1. In the district court, Roth clearly argued that the 2001 FOIA response contained undisclosed *Brady* material. *See* Compl. ¶ 9 (alleging that the FBI and the U.S. Attorney's Office had failed to provide evidence to Bower's trial counsel "in violation of *Brady v. Maryland*"); Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. 6 ("The information and/or documents withheld from the 1990 FOIA production but produced in 2001 included evidence that would have supported Mr. Bower's defense and, in Plaintiff's view, constituted material, exculpatory information that should have been turned over to the defense before trial, pursuant to *Brady v. Maryland* . . . ."); *id.* at 28 ("Through documents that the FBI finally released in 2001 . . . , Mr. Bower has learned that during his trial, the FBI failed to produce what he believes is material and exculpatory information regarding the murders . . . ."). If the government wished to challenge Roth's failure to present a sworn declaration or other evidence demonstrating that the information produced in 2001 had not previously been disclosed, it should have done so in the district court. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (quoting Fed. R. Civ. P. 56(c) (1986))). The government's single comment that "Roth ha[d] failed to proffer any evidence, much less compelling evidence, that the FBI engaged in any illegal activity" was hardly sufficient to alert Roth that the government meant to challenge his claim that the information revealed in 2001 had not previously been turned over to Bower's trial attorney. Def.'s Reply & Opp'n to Pl.'s Cross Mot. 14. Had the government raised this challenge in the district court, Roth might have responded with an affidavit stating that the information produced in 2001 was not disclosed at the time of Bower's trial. *See* Roth Decl. ¶ 12, *Bower v. Director, Tex. Dep't of Crim. Justice–Inst'l Div.*, No. 1:92cv182 (E.D. Tex. July 12, 2002) (averring in a declaration submitted in Bower's federal habeas proceeding that "[m]ost of the documents produced in the 2001 FOIA response" were not made available to Bower's trial counsel). But having failed to raise the argument in the district court in a manner sufficient to put Roth on notice of the need to rebut it, the government is barred from doing so for the first time on appeal. *See, e.g.*, *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 851 (D.C. Cir. 2010). As a result, we shall assume that the favorable evidence the FBI released in 2001 had not been provided to Bower's trial counsel.

Even under this assumption, however, Roth's argument—that the public has a significant interest in knowing whether the federal government failed to disclose *Brady* material regarding Gordon, Langford, or Ford—still

falters at the *Favish* threshold. Roth argues (1) that the FBI's 2001 FOIA response contained undisclosed *Brady* material, and (2) that one can infer from this fact that the FBI might have other such material in its possession. But the first step of this argument fails given the Fifth Circuit's decision affirming the denial of Bower's federal habeas petition. *See Bower*, 497 F.3d at 476–77. Reviewing the very FBI disclosures Roth contends constituted *Brady* material, the Fifth Circuit concluded that the information "was not material" for purposes of *Brady*. *Id.* at 477. Our case law requires that we defer to this decision. *See Martin v. Dep't of Justice*, 488 F.3d 446, 453, 456–58 (D.C. Cir. 2007) (deferring to a district court's decision in a separate habeas proceeding that the information sought by a FOIA requester was "not *Brady* material").

Having disposed of Roth's argument that he is entitled to further disclosures based on the public's interest in revealing *Brady* violations, we turn to the far more interesting question of whether Roth may overcome the FBI's *Glomar* response based on the public's more general interest in knowing whether the FBI is withholding information that could corroborate Bower's claim of innocence. To demonstrate that this interest is likely to be advanced by disclosing whether the FBI's files contain records regarding Gordon, Langford, or Ford, Roth must show that a reasonable person could believe that the following might be true: (1) that the Oklahoma drug dealers were the real killers, and (2) that the FBI is withholding information that could corroborate that theory. *See Favish*, 541 U.S. at 174. In our view, Roth has made both showings.

Since Bower's trial, two witnesses—Langford's ex-girlfriend and Leckie's widow—have provided sworn statements implicating the Oklahoma drug dealers. When

combined with the evidence in the FBI's 2001 FOIA response that one of the murder victims may have been involved with illegal gambling and drug dealing and that the ammunition used in the murders was not as rare as the prosecution claimed and could be put to legitimate uses, these witnesses' statements might well cause a reasonable person to doubt Bower's guilt. With respect to the second showing Roth must make—that a reasonable person could believe that the FBI might be withholding information that could corroborate Bower's claim of innocence—there can be no doubt that the FBI in the past has failed to disclose information favorable to Bower upon request. The agency's 2001 FOIA response contained information that was neither disclosed to Bower's trial counsel nor produced in response to similar FOIA requests submitted on Bower's behalf in 1989. As explained above, Bower now relies on some of this previously undisclosed information to bolster his claim of innocence. The fact that the FBI withheld such information until 2001, approximately seventeen years after Bower's trial, "would warrant a belief by a reasonable person" that the FBI "might" have other potentially exculpatory information in its files, possibly including information regarding Gordon, Langford, or Ford. *Id.*

At oral argument, government counsel urged us to disregard the statements of Langford's ex-girlfriend because a state habeas court in Texas found that an affidavit setting forth her story bore "no indicia of reliability." *Ex parte Bower*, Nos. 33426-A, 33427-A, 33428-A, 33429-A, slip op. at 2 (Tex. 15th Dist. Ct. Jan. 11, 1990). But by raising this contention for the first time at oral argument, the government deprived Roth of a meaningful opportunity to respond. The argument is thus forfeited. *See United States v. Southerland*, 486 F.3d 1355, 1360 (D.C. Cir. 2007) (noting that an argument raised for the first time at oral argument is generally

considered forfeited). In addition, although Roth has not filed in this litigation the affidavits of Langford's ex-girlfriend and Leckie's widow, the decision denying Bower's federal habeas petition describes the testimony given by Langford's ex-girlfriend in those proceedings, *see Bower Habeas Op.*, No. 1:92cv182, slip op. at 23–24, and the government's brief on appeal neither disputes Roth's summary of the information contained in the affidavit of Leckie's widow nor specifically challenges Roth's failure to file the affidavit with the district court, *see United States v. Ford*, 184 F.3d 566, 578 n.3 (6th Cir. 1999) ("Even appellees waive arguments by failing to brief them.").

In contrast to Roth's *Brady* argument, the deference we owe the Fifth Circuit's habeas decision does not prevent us from concluding that Roth has satisfied the *Favish* standard with respect to his claim that the public has an interest in knowing whether the FBI is withholding information that could corroborate a death-row inmate's claim of innocence. That interest in no way hinges on the doctrinal complexities of *Brady* and its progeny. As explained above, it is at best unclear the extent to which the *Brady* framework would apply to evidence whose materiality became apparent only after the defendant had been convicted and sentenced. *See Skinner*, 131 S. Ct. at 1300; *Osborne*, 129 S. Ct. at 2320. Certainly, there is no indication that the Fifth Circuit, in conducting its *Brady* analysis, considered the affidavits of Langford's ex-girlfriend and Leckie's widow. *See Bower*, 497 F.3d at 476–77. As a result, there is no conflict between the Fifth Circuit's affirmance of the denial of Bower's habeas petition and our holding here that Roth has shown that a reasonable person could believe that the FBI might be withholding information that could corroborate Bower's claim of innocence.

Since Roth has satisfied his obligations under *Favish*, we must proceed to balance the public and private interests at stake in this case. *Favish*, 541 U.S. at 174; *see also Boyd*, 475 F.3d at 387. Although Gordon, Langford, and Ford have a significant interest in avoiding any association with a criminal investigation into a quadruple homicide, *see, e.g.*, *Schrecker*, 349 F.3d at 666, the public also has a compelling interest in knowing whether the FBI is refusing to disclose information that could help exonerate Bower. Weighing the competing interests, we conclude that the balance tilts decidedly in favor of disclosing whether the FBI's files contain information linking Gordon, Langford, or Ford to the FBI's investigation of the killings. As a result, we shall reverse the district court's rejection of Roth's challenge to the FBI's *Glomar* response and remand for further proceedings.

In doing so, however, we emphasize that the FBI need not disclose whether it has information about the three men that is unrelated to its investigation into the 1983 murders. The public's interest is in knowing whether the FBI's files contain information that could corroborate Bower's claim of innocence, not in knowing all information the FBI may have about the three men. That said, the FBI will need to reveal the existence of any records connecting Gordon, Langford, or Ford to the agency's investigation into the 1983 murders. Of course, if such records exist, they may well fall within one or more FOIA exemptions. For example, if in the course of its investigation the FBI obtained the criminal history records of Gordon, Langford, or Ford, those records would be immune from disclosure. *See Reporters Comm.*, 489 U.S. at 776–80. But the mere fact that records fall within a FOIA exemption provides no justification for failing to acknowledge their existence. Given the significant public interest in knowing whether the FBI is withholding information that could potentially help Bower prove his innocence, the FBI must

either produce any records it has linking Gordon, Langford, or Ford to its investigation into the four murders, or it must follow the normal practice in FOIA cases of identifying the records it has withheld and stating its reasons for doing so. *See Vaughn*, 484 F.2d at 826–28.

Taking a different approach, the dissent presents the following syllogism: (1) our case law has embraced the categorical rule that the public's interest in revealing *Brady* violations "does not suffice to override the privacy interests of third parties named in . . . law enforcement files," Dissenting Op. at 3; (2) for purposes of FOIA, there is no "meaningful" difference between the public's interest in learning of *Brady* violations and the public's interest in uncovering the government's post-trial withholding of information that could corroborate a convicted defendant's claim of innocence, *id.* at 4; (3) therefore, our case law supports a categorical rule that the latter interest cannot outweigh privacy interests protected by Exemption 7(C), *see id.* The syllogism fails at the first premise. Despite the dissent's assumption to the contrary, this circuit has expressly refrained from deciding whether to adopt a categorical rule that the public's interest in revealing *Brady* violations cannot overcome government invocations of Exemption 7(C). *See Martin*, 488 F.3d at 458 (noting that the "issue remains an open question in this circuit"). Certainly, we have never held that the public's interest in revealing *Brady* violations is categorically insufficient to warrant disclosure where, as here, an individual has been sentenced to death. And to be clear, we reach no such holding here. True, we have distinguished between the public's interest in knowing whether the federal government violated Bower's *Brady* rights and the public's interest in learning whether the FBI is withholding information that could corroborate Bower's claim of innocence. *See supra* pp. 20–21. But our drawing of this distinction had nothing to do with the question

of whether a categorical rule bars FOIA requesters from seeking *Brady* material implicating third-party privacy interests. Instead, we discussed the difference between Roth's *Brady* and non-*Brady* related public-interest theories to explain why the Fifth Circuit's habeas decision, which fatally undermined Roth's *Brady*-related theory, did not also doom his non-*Brady* theory. *See supra* p. 30.

Perhaps recognizing the weakness of its syllogism, the dissent also contends that the Supreme Court's decision in *Reporters Committee* supports a categorical rule that the public's interest in learning whether the government is withholding information that could corroborate a death-row inmate's claim of innocence cannot overcome third-party privacy interests protected by Exemption 7(C). But *Reporters Committee* is readily distinguishable from this case. There, the FOIA requesters sought a private citizen's criminal history record, the disclosure of which the Court concluded would do "little or nothing" to further FOIA's purpose of informing the public about "what the[] government is up to." 489 U.S. at 773–75 (internal quotation marks omitted); *see also id.* at 780 ("[W]e hold as a categorical matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, *and that when the request seeks no 'official information' about a Government agency, but merely records that the Government happens to be storing*, the invasion of privacy is 'unwarranted.' " (emphasis added)). Here, by contrast, requiring the FBI to disclose whether it possesses any records linking Gordon, Langford, or Ford to its investigation of the quadruple murder would "shed . . . light on the conduct of a[] Government agency." *Id.* at 773. In particular, it would further the public's interest in revealing whether the FBI is withholding information that could corroborate the claim of innocence of a man whom it helped

put on death row. *Cf. id.* (noting that in *Reporters Committee*, the requesters did "not intend to discover anything about the conduct of the agency that ha[d] possession of the requested records").

"[B]orrow[ing] the words of *Reporters Committee*," the dissent nonetheless believes that the balance between public and private interests "characteristically will tip . . . in favor of non-disclosure when a requester seeks *private* information about third parties contained in files related to a criminal prosecution." Dissenting Op. at 5. Why? Because, the dissent answers, "the public interest in accurately assessing criminal liability or exposing prosecutorial or investigative misconduct is invariably lessened in the FOIA context by the existence of traditional criminal and civil litigation processes where that public interest is directly addressed." *Id.* The dissent cites no authority in support of this proposition, which is hardly surprising. It simply makes no sense to say that the public's interest in a particular piece of information is reduced merely because multiple mechanisms might exist for obtaining that information. The dissent makes much of the fact that the type of information Roth seeks may be available through criminal and civil discovery. *See id.* at 3, 8. But we have made clear that the potential availability of criminal and civil discovery in no way bars an individual from obtaining information through FOIA where no exemption otherwise applies. *See Morgan v. U.S. Dep't of Justice*, 923 F.2d 195, 198 (D.C. Cir. 1991). "Indeed, there are situations in which FOIA will permit access to information that would not be available through discovery." *Id.* (internal quotation marks omitted). Furthermore, the "criminal and civil litigation processes" discussed by the dissent would be unavailable to a FOIA requester who, unlike Roth, has no relationship with Bower. Dissenting Op. at 5. The dissent's approach thus appears inconsistent with the fundamental FOIA principle that "the

identity of the requesting party has no bearing on the merits of his or her FOIA request." *Reporters Comm.*, 489 U.S. at 771. For all these reasons, although we of course agree with the dissent that *Reporters Committee* makes clear that categorical rules "may be appropriate" in FOIA cases, we nonetheless believe that the dissent has failed to justify its proposed categorical approach because it has provided no persuasive explanation as to why this particular "case fits into a genus in which the balance [between public and private interests] characteristically tips in one direction." *Id.* at 776.

Finally, and in our minds sealing the point, the dissent's categorical approach risks producing absurd consequences that we highly doubt Congress intended. For example, under the dissent's rationale, it appears that we would have to uphold the FBI's withholding of information under Exemption 7(C) even if we knew for certain from the FBI's *in camera* submission that the agency is deliberately withholding records that conclusively show that the Oklahoma drug dealers were the true killers. We decline to adopt a rule so at odds with "FOIA's prodisclosure purpose." *Favish*, 541 U.S. at 174. Instead, we have engaged in the balancing contemplated by Exemption 7(C), concluding that in the circumstances of this case, where the FOIA requester has surmounted the fairly substantial hurdle of showing that a reasonable person could believe that the FBI might be withholding information that could corroborate a death-row inmate's claim of innocence, the balance militates in favor of fuller disclosure. *See id.* at 171 (noting that Exemption 7(C) requires courts "to balance the [third party's] privacy interest against the public interest in disclosure").

## III.

This brings us finally to Roth's challenge to the FBI's withholding of information under Exemption 7(D). This issue

relates only to information redacted from the documents we have reviewed *in camera*. It has no implications for the FBI's *Glomar* response, which the agency sought to justify only under Exemption 7(C).

Where, as here, the records at issue were "compiled by criminal law enforcement authorit[ies] in the course of a criminal investigation," they are covered by Exemption 7(D) if producing the records "could reasonably be expected to disclose the identity of a confidential source" or "information furnished" by such a source. 5 U.S.C. § 552(b)(7)(D). The agency invoking Exemption 7(D) bears the burden of proving that it applies, and with respect to the FBI, it is not enough for the agency to claim that all sources providing information in the course of a criminal investigation do so on a confidential basis. *See U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171, 181 (1993). Instead, the FBI must "point to more narrowly defined circumstances that . . . support the inference" of confidentiality. *Id.* at 179. When no express assurance of confidentiality exists, courts consider a number of factors to determine whether the source nonetheless "spoke with an understanding that the communication would remain confidential." *Id.* at 172. These factors include "the character of the crime at issue," "the source's relation to the crime," whether the source received payment, and whether the source has an "ongoing relationship" with the law enforcement agency and typically communicates with the agency "only at locations and under conditions which assure the contact will not be noticed." *Id.* at 179 (internal quotation marks omitted). Even when the FBI contends that a source received an express assurance of confidentiality, it must, in order to "permit meaningful judicial review," present sufficient evidence that such an assurance was in fact given. *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 34 (D.C. Cir. 1998).

Unlike Exemptions 6 and 7(C), Exemption 7(D) requires no balancing of public and private interests. *See Parker v. Dep't of Justice*, 934 F.2d 375, 380 (D.C. Cir. 1991). If the FBI's production of criminal investigative records "could reasonably be expected to disclose the identity of a confidential source" or "information furnished by" such a source, that ends the matter, and the FBI is entitled to withhold the records under Exemption 7(D). 5 U.S.C. § 552(b)(7)(D).

Roth complains that the FBI's *Vaughn* index and supplemental *Vaughn* index contain "only generic statements regarding confidentiality," thus failing to satisfy the FBI's burden of proving that the withheld information came from or could identify a confidential source. Appellant's Opening Br. 44. Under our case law, agencies invoking a FOIA exemption must provide a specific, detailed explanation of why the exemption applies to the withheld materials. *See Vaughn*, 484 F.2d at 826–28. Reviewing documents *in camera* is no "substitute for the government's obligation to provide detailed public indexes and justifications whenever possible." *Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455, 1463 (D.C. Cir. 1984). Requiring agencies to provide public explanations for their redactions allows for adversarial testing of the agencies' claims, which helps focus the court's attention on the most important issues in the litigation and may reveal not otherwise apparent flaws in the agencies' reasoning. *See id.*; *see also Vaughn*, 484 F.2d at 828. That said, we have recognized "that there are occasions when extensive public justification would threaten to reveal the very information for which a FOIA exemption is claimed." *Lykins*, 725 F.2d at 1463. Although in such a case an agency is still required to provide as much public explanation as it can without "giving away the information it is trying to withhold," it may supplement its

explanation by making the documents available for *in camera* review. *Id.* at 1463–64.

Here, the FBI has generally struck an appropriate balance, publicly explaining to the extent it can why it has concluded that certain sources provided information under an express or implied assurance of confidentiality and then relying on *in camera* judicial review to confirm its conclusions. The FBI invoked Exemption 7(D) with respect to four categories of sources: local law enforcement agencies; informants who have been assigned confidential source symbol numbers; third parties without source symbol numbers who nonetheless provided information under an express assurance of confidentiality; and third parties who provided information under an implied assurance of confidentiality. *See Roth*, 656 F. Supp. 2d at 165. We have no need to assess the sufficiency of the FBI's explanation for its conclusion that local law enforcement agencies provided information with an expectation of confidentiality because the limited amount of information that the FBI withheld based on this rationale also implicates personal privacy interests and thus falls within the scope of Exemption 7(C). With respect to source-symbol-number informants, the FBI explains in its *Vaughn* index that it "assigns permanent source symbol numbers . . . to confidential informants who report information to the FBI on a regular basis pursuant to an 'express' assurance of confidentiality." First Hardy Decl. ¶ 83. Given that Roth fails to directly challenge this statement on appeal, we conclude that the FBI has borne its burden of proving that it provided an express assurance of confidentiality to the source-symbol-number informants mentioned in the *in camera* documents. *See Mays*, 234 F.3d at 1328–29 (upholding the FBI's withholding of information furnished by a "coded informant" based on an affidavit "describ[ing] the DEA's standard practice of identifying

confidential informants" with such codes (internal quotation marks omitted)).

The remaining Exemption 7(D) redactions relate to informants to whom the FBI assigned no source symbol numbers. Having reviewed the documents and the *Vaughn* indexes, we think it obvious that most of these individuals provided information under an express or implied assurance of confidentiality. The documents the parties have labeled "Roth/Bower 98–99, 111, and 477" convey information provided by two sources who "specifically requested [that] their identities not be disclosed because they feared reprisal." First Hardy Decl. ¶ 87. Indeed, the documents themselves contain positive indications that the FBI gave the sources express assurances of confidentiality. Specifically, the documents state that one source "desired to remain anonymous," and the name of the second source is followed by the words "protect identity" in parentheses. Similarly, Roth/Bower 206 indicates that the source discussed in that document "confidentially advised" the FBI of certain information, thus indicating that the source had an expectation of confidentiality. With respect to Roth/Bower 129, the FBI's supplemental *Vaughn* index explains that the source discussed in the document "provided information to the FBI for a number of years as a confidential informant with an express promise of confidentiality." Second Hardy Decl. ¶ 20. Finally, the *Vaughn* index states that the source discussed in Roth/Bower 254 and 256 "provided specific detailed information that is singular in nature concerning the criminal activities involving [Bower], his associates, and/or other subjects of [the FBI's] investigation." First Hardy Decl. ¶ 81. Although this statement is quite conclusory, the FBI might well have had difficulty revealing much more information without running the risk of divulging the source's identity. Having reviewed Roth/Bower 254 and 256 *in camera*, we

conclude that given the brutal nature of the quadruple homicide and the source's relationship with at least some of the victims, the source likely provided information to the FBI "with an understanding that the communication would remain confidential." *Landano*, 508 U.S. at 172.

But our *in camera* review discloses two instances in which the FBI's stated explanation for redacting information under Exemption 7(D) fails to correspond to the information actually contained in the documents. Although the FBI claims that the last paragraph of Roth/Bower 108 contains information provided by an informant who had been assigned a source symbol number, no such informant is mentioned in that paragraph. Instead, the paragraph describes information obtained by a local law enforcement agent in an interview with a named individual. The other problematic redactions appear in the carryover paragraph of Roth/Bower 112–13. Although the FBI has properly redacted information from this paragraph's second sentence that relates to a source-symbol-number informant, it has failed to provide any support for its contention that each of the other sources discussed in the carryover paragraph received express assurances of confidentiality. *See* First Hardy Decl. ¶ 87–88; Second Hardy Decl. ¶ 18.

Accordingly, the FBI has failed to bear its burden of proving that the information redacted from the last paragraph of Roth/Bower 108 and the carryover paragraph of Roth/Bower 112–13 (with the exception of the second sentence) falls within the scope of Exemption 7(D). That said, the FBI has properly invoked Exemptions 6 and 7(C) to withhold information implicating personal privacy interests. We leave the task of separating the wheat from the chaff to the district court in the first instance. Specifically, the court should first determine which portions of the two paragraphs

fall within Exemptions 6 and 7(C) and then order the FBI to produce all segregable, non-exempt information. *See* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

## IV.

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

*So ordered.*

KAVANAUGH, *Circuit Judge*, concurring in part and dissenting in part[1]:

In 1984, Lester Bower was convicted by a Texas state-court jury of murdering four men. Bower was sentenced to death. His conviction and death sentence have been affirmed on appeal, in state habeas proceedings, and in federal habeas proceedings.

Bower maintains that he is innocent. He cites two witnesses who came forward and suggested that four Oklahoma drug dealers were responsible for these murders.

Pursuant to Texas law, Bower is pursuing a post-conviction DNA proceeding in Texas state court in an attempt to show his innocence. His execution remains on hold as a matter of state law while that process continues.

This is a federal Freedom of Information Act case, not a criminal, habeas, or clemency proceeding. Bower's attorney, Anthony Roth, submitted FOIA requests and asked the FBI to release documents related to the underlying criminal investigation of these killings, as well as records relating to the four men that Bower claims committed the murders.

Because the original criminal investigation into these murders was conducted by federal as well as state investigators, the FBI possessed a number of responsive documents. The FBI turned over many of those documents to Roth in response to his FOIA request. But the FBI declined to produce documents (or portions thereof) that contained *private* information about third parties, including about the

---

[1] I join Part III of the majority opinion, which addresses Exemption 7(D). I dissent from Part II, which addresses Exemption 7(C). This separate opinion focuses solely on the Exemption 7(C) issue.

three still-living Oklahoma drug dealers. In declining to produce such information, the FBI cited FOIA Exemption 7(C). That exemption authorizes the Government to withhold law enforcement files the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

Interpreting Exemption 7(C), the Supreme Court and this Court have ruled that FOIA ordinarily is not a proper tool for the public to obtain information from law enforcement files relating to a criminal prosecution when disclosing the information would infringe the privacy interests of third parties. *See Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 761-71, 780 (1989); *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 173-75 (2004); *Martin v. Dep't of Justice*, 488 F.3d 446, 457 (D.C. Cir. 2007); *Boyd v. Criminal Division of the Dep't of Justice*, 475 F.3d 381, 387-88 (D.C. Cir. 2007); *Oguaju v. United States*, 378 F.3d 1115, 1116-17 (D.C. Cir. 2004); *Schrecker v. Dep't of Justice*, 349 F.3d 657, 666 (D.C. Cir. 2003); *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 998-99 (D.C. Cir. 1998); *Computer Professionals for Social Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 903-05 (D.C. Cir. 1996); *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 896 (D.C. Cir. 1995); *Davis v. Dep't of Justice*, 968 F.2d 1276, 1281-82 (D.C. Cir. 1992); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1205-06 (D.C. Cir. 1991); *Fitzgibbon v. CIA*, 911 F.2d 755, 767-68 (D.C. Cir. 1990); *King v. Dep't of Justice*, 830 F.2d 210, 233-35 (D.C. Cir. 1987); *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 861-66 (D.C. Cir. 1981); *Baez v. Dep't of Justice*, 647 F.2d 1328, 1337-39 (D.C. Cir. 1980); *cf. Morgan v. Dep't of Justice*, 923 F.2d 195, 198 (D.C. Cir. 1991); *North v. Walsh*, 881 F.2d 1088, 1094 (D.C. Cir. 1989).

As this Court has said, "privacy interests are particularly difficult to overcome when law enforcement information

regarding third parties is implicated." *Martin*, 488 F.3d at 457. Moreover, "the Supreme Court has made clear that requests for such third party information are strongly disfavored." *Id.* In the context of an Exemption 7(C) challenge, the Supreme Court has stated that "disclosure of records regarding private citizens, identifiable by name, is not what the framers of the FOIA had in mind." *Reporters Committee*, 489 U.S. at 765. As the courts have explained, the public interest in ensuring that innocent people are not wrongly convicted or subjected to prosecutorial or investigative misconduct is properly vindicated in the ordinary criminal and civil litigation processes – where personal privacy is not as weighty a consideration as it is under FOIA. *See* FED. R. CRIM. P. 16; *Brady v. Maryland*, 373 U.S. 83, 86 (1963); *see also* FED. R. CIV. P. 26; *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); 42 U.S.C. § 1983.

Roth argues that the requested documents would show that the Federal Government withheld exculpatory information and violated its *Brady* obligations with respect to Bower's 1984 Texas state-court trial. But the claimed *Brady* violation has been addressed in Bower's criminal and habeas proceedings and, as our precedents have consistently indicated, does not suffice to override the privacy interests of third parties named in such law enforcement files. *See, e.g.*, *Martin*, 488 F.3d at 457; *Boyd*, 475 F.3d at 387-88; *Oguaju*, 378 F.3d at 1117.

Roth also suggests – albeit only in passing – that this case is not controlled by the settled FOIA precedents because those cases are about proving the defendant's innocence *at trial*. Here, according to Roth, the requested documents, in conjunction with the witnesses who emerged after trial, could demonstrate Bower's innocence during the ongoing *post-conviction proceedings*. The majority opinion has accepted Roth's argument and distinguished (i) the public interest in

showing a criminal defendant's innocence at trial from (ii) the public interest in showing a criminal defendant's innocence during a post-conviction proceeding. In my view, that distinction makes little sense under Exemption 7(C) and finds no support in the case law. For purposes of FOIA, Roth's post-conviction theory does not differ in any meaningful way from the *Brady*-based theory that our precedents have consistently rejected. After all, if FOIA does not require disclosure of private information that could exonerate a man *at trial*, how can FOIA require disclosure of private information that could exonerate a man *in a post-conviction habeas or clemency proceeding*? The majority opinion cannot persuasively answer that question.

The FOIA precedents set forth a clear juridical principle – namely, that FOIA ordinarily cannot be used to obtain *private* information from law enforcement files relating to a criminal prosecution. Consistent with the statutory text – which refers to disclosures that "*could reasonably be expected* to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C) (emphasis added) – the Supreme Court has specifically promoted the use of categorical rules in FOIA Exemption 7(C) cases. *See Dep't of Justice v. Landano*, 508 U.S. 165, 177 (1993) (*Reporters Committee*'s "approval of a categorical approach was based in part on the phrase 'could reasonably be expected to,' which Congress adopted in 1986 to ease the Government's burden of invoking Exemption 7 and to replace a focus on the effect of a particular disclosure with a standard of reasonableness . . . based on an objective test'") (internal quotation marks and citations omitted; alteration in original). The Court has stated that "categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction." *Reporters Committee*, 489 U.S. at 776; *cf. NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236 (1978) (similarly approving generic categorical approach under Exemption 7(A)). In such

instances, "a disparity on the scales of justice holds for a class of cases without regard to individual circumstances; the standard virtues of bright-line rules are thus present, and the difficulties attendant to ad hoc adjudication may be avoided." *Reporters Committee*, 489 U.S. at 780.

To borrow the words of *Reporters Committee*, the balance tips – and characteristically will tip – in favor of non-disclosure when a requester seeks *private* information about third parties contained in files related to a criminal prosecution. The privacy interests of third parties who are named in law enforcement documents are invariably strong. Indeed, the majority opinion acknowledges that those interests are "significant." Maj. Op. at 16. And the public interest in accurately assessing criminal liability or exposing prosecutorial or investigative misconduct is invariably lessened in the FOIA context by the existence of traditional criminal and civil litigation processes where that public interest is directly addressed. Therefore, the *Reporters Committee* categorical approach is appropriate here.

The majority opinion argues that the case law has not specifically articulated such a categorical principle. It is true that the precedents have not set forth expansive reasoning in rejecting arguments of the kind advanced by Roth here, no doubt because the argument is ultimately insufficient as a matter of FOIA law. Here, because the majority opinion is charting a new course, I have attempted to explain the essential reasoning that undergirds those many decisions. The majority opinion counters that the FOIA public interest is not lessened merely because there are other avenues for obtaining information from the government relating to a criminal prosecution. But what reason other than the existence of those alternative forums could support our long line of cases rejecting FOIA requests for private information in law enforcement files related to a criminal prosecution? After all, considered in isolation from the other criminal and civil

processes, the public interest in ensuring that an innocent person is not wrongly imprisoned is extraordinarily high, yet it is routinely deemed insufficient in Exemption 7(C) cases. The reason is evident: Other criminal and civil processes exist to vindicate that public interest. The majority opinion purports to accept the holdings of our prior cases rejecting claims like Roth's, but it rejects their essential rationale and offers no other rationale to explain those decisions.

For present purposes, the key point is that there is a long line of precedent rejecting the kind of argument advanced here by Roth. Those cases have established in common-law-like fashion a principle that FOIA ordinarily does not authorize disclosure when a requester seeks *private* information about third parties contained in files related to a criminal prosecution. Recognizing that principle is consistent with – indeed encouraged by – *Reporters Committee*.

Reaching farther afield, the majority opinion also cites a non-7(C) case saying that the availability of discovery does not defeat a FOIA claim "where no exemption otherwise applies." Maj. Op. at 34 (citing *Morgan v. Dep't of Justice*, 923 F.2d 195, 198 (D.C. Cir. 1991)). Of course that's true. But that's not the issue here. The question here concerns how to weigh public and privacy interests in 7(C) cases. In the Exemption 7(C) context, the cases establish that the asserted public interest in determining a defendant's guilt is lessened because that interest is vindicated in the ordinary criminal and civil processes.

In the end, the majority opinion distinguishes away a slew of applicable precedents by decreeing a new death penalty exception that overrides Exemption 7(C)'s protection of personal privacy. The result in this FOIA case, by the majority opinion's own admission, would be different if Bower were serving a sentence of life imprisonment. Of course, the information sought here goes to Bower's guilt, not

to his sentence. The majority opinion's reasoning, which rests on Bower's death sentence, is thus an odd fit with the nature of the information sought. Beyond that, the major problem with the majority opinion's approach is that there is no statutory or precedential support for creating a new death penalty exception to the important privacy protection in Exemption 7(C). Creating any such exception is a decision properly left to Congress and the Executive Branch. In justifying its new death penalty exception, the majority opinion lobs a rhetorical volley, saying that the opposing position would allow the government to deliberately and knowingly kill an innocent man. That is wildly inaccurate. The traditional processes such as habeas, clemency, and the like are constitutionally and statutorily designed to prevent such a travesty of justice. As the Supreme Court said, "the framers of the FOIA" did not have in mind "disclosure of records regarding private citizens, identifiable by name." *Reporters Committee*, 489 U.S. at 765. Moreover, if federal government officials are violating their legal and ethical disclosure responsibilities in the criminal justice and clemency forums, it is unclear why the majority opinion thinks those same officials would suddenly comply with FOIA orders.

Here as elsewhere, general or categorical principles can be overcome in extraordinary cases. *Cf. Herrera v. Collins*, 506 U.S. 390, 425-26 (1993) (O'Connor, J., concurring). In this case, however, Roth seeks to undermine Bower's conviction and show alleged prosecutorial misconduct – interests that have been routinely asserted and rejected in FOIA cases as insufficient to override Exemption 7(C)'s protection for personal privacy. *See, e.g.*, *Martin*, 488 F.3d at 457; *Boyd*, 475 F.3d at 387-88; *Oguaju*, 378 F.3d at 1116-17; *Spirko*, 147 F.3d at 998-99; *Computer Professionals for Social Responsibility*, 72 F.3d at 903-05. Claims of innocence and prosecutorial or investigative misconduct of one form or another – failing to disclose relevant evidence, pressuring

witnesses, encouraging or allowing false testimony, for example – are standard arguments by the defense in federal criminal prosecutions.  The criminal process is designed to expose and resolve such charges and counter-charges.  And civil *Bivens* and § 1983 actions are available as well for citizens to seek redress for prosecutorial or investigative misconduct.  FOIA, by contrast, was not designed to require public disclosure of *private* information in order to serve those purposes.

\* \* \*

In other forums, Bower has rightly been able to obtain discovery from the Government and challenge his guilt.  Our legal system accommodates pre-conviction claims of innocence through the criminal trial itself.  And our legal system accommodates post-conviction claims of innocence – including those based on newly discovered evidence – through new trial motions, appeals, habeas proceedings, the executive clemency process, and in recent times DNA procedures such as the process that Texas has employed in Bower's case.  *See generally Herrera*, 506 U.S. at 411-16.  If there are questions about Bower's guilt, those are the proper forums for resolving those questions.  I believe it essential for judicial and executive officials to ensure – particularly in death penalty cases – that claims of innocence based on newly discovered evidence are properly explored.  But given FOIA's critical protection for personal privacy and the many other processes available for vindicating a defendant's innocence claim, the Supreme Court and this Court have held that FOIA ordinarily is not an appropriate tool to obtain information from law enforcement files relating to a criminal prosecution when disclosure would infringe the privacy interests of third parties.  That settled principle controls this case.

I respectfully dissent from the majority opinion's decision regarding Exemption 7(C).