2016 DEC 19 AM 11: 3



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| MICHAEL MOCKOVAK, | ) | No. 74459-3-I |
| Appellant, | ) | DIVISION ONE |
| v. | ) | |
| KING COUNTY, a political subdivision of Washington State; and the KING COUNTY PROSECUTING ATTORNEY'S OFFICE, a local public agency, | ) | UNPUBLISHED<br><br>FILED: December 19, 2016 |
| Respondents. | ) | |

Cox, J. — Michael Mockovak appeals the trial court's summary judgment order and the order denying his motion to compel discovery. There are no genuine issues of material fact regarding the first order. And King County and the King County Prosecutor are entitled to judgment as a matter of law. As for the second order, the trial court did not abuse its discretion in denying discovery. We affirm.

In 2010, a jury found Michael Mockovak guilty of soliciting and attempting to murder his business partner among other charges.[1] This court affirmed the judgment and sentence on appeal[2] and later denied his personal restraint petition.[3]

Mockovak's convictions arose out of a joint federal-state investigation conducted by the Puget Sound Safe Streets Violent Crimes Task Force (the "Task Force"). This body includes both federal and state law enforcement officers specially appointed to federal positions. Leonard Carver was a Detective with the Seattle Police Department (SPD), appointed as a Federal Bureau of Investigation (FBI) Task Force Officer and Special Deputy U.S. Marshal. In this capacity, he had investigatory and arrest authority for violations of federal law.[4]

The task force employed a confidential informant in its investigation named Daniel Kultin, a Russian émigré and Mockovak's employee. Kultin contacted the FBI after Mockovak told him "maybe in a joke way," but not as a "funny joke" that he wanted his business partner killed.[5] In the following months,

---

[1] State v. Mockovak, No. 66924-9-I, slip op. at *1 (Wash. Ct. App. May 20, 2013) (unpublished), http://www.courts.wa.gov/opinions/pdf/669249.pdf.

[2] Id. at *2.

[3] In re Mockovak, No. 69390-5-I, slip op. at *15 (Wash. Ct. App. June 6, 2016) (published), http://www.courts.wa.gov/opinions/pdf/693905.pdf.

[4] As discussed, the parties dispute whether Leonard Carver was only an SPD Detective or a federal Officer as well. We will refer to him only by last name.

[5] In re Mockovak, No. 69390-5-I, slip op. at *2.

Kultin entertained such entreaties, which grew increasingly serious. The two arranged for Kultin to hire someone who was supposed to be a hitman in the Russian mafia to perform the murder. Soon after they made this deal, law enforcement arrested Mockovak.

The King County Prosecuting Attorney (KCPA) and the United States Department of Justice (DOJ) agreed that the State should prosecute Mockovak under state law. In preparing for trial, the KCPA and United States Attorney's Office (USAO) consulted regularly about the process to obtain and release federal investigation documents. This complex process for release led to occasional tension in their communications.

While incarcerated following his convictions, Mockovak brought this public records case against King County and the KCPA. He sought all documents in the KCPA's possession referring to Kultin's immigration status.

The County and the KCPA soon began providing records, many heavily redacted to protect work product, along with an exemption log sheet. The County and the KCPA also refused to disclose Kultin's National Crime Information Center (NCIC) Report, arguing they were barred from doing so by federal statute.

In June 2015, the County and KCPA moved for summary judgment. Along with the motion, the KCPA filed sealed and unredacted copies of 130 documents for in camera review. Mockovak argues that these were improperly redacted.

Mockovak moved for partial summary judgment. The effect of his motion was to reduce the number of contested document redactions to 81. He organized the challenged documents into three categories, which we describe in more detail later in this opinion.

The trial court granted summary judgment to the County and KCPA, denying Mockovak's partial summary judgment motion. This order was entered on November 23, 2015.

In August 2015, Mockovak sought to depose Carver. The USAO responded and explained that Carver could not testify or provide documents without the approval of the U.S. Attorney because he was a federal employee. Mockovak moved for an order compelling Carver's deposition. The United States appeared and opposed the motion, arguing that the court lacked jurisdiction to compel a federal employee to testify. The trial court denied the motion to compel in an order, entered on November 25, 2015.

Mockovak appeals by a notice of appeal filed on December 22, 2015.

## TIMELINESS

As a preliminary matter, the County and the KCPA argue that this appeal is untimely. We disagree.

RAP 2.2(a) generally bars a party from appealing rulings in a case until after entry of a final judgment. The question is how that applies in this case.

The parties agree that Mockovak filed his notice of appeal in this case after the court entered orders granting the County's and the KCPA's motion for summary judgment, denying Mockovak's and denying his discovery motion. The

4

trial court had yet to enter an order to finalize an offer of judgment disposing of claims already settled between the parties. But that fact does not preclude our review.

When a party appeals a trial court order before the trial court has fully disposed of the case, "substance controls over form and [we] look[] to the content of a document rather than its title."[6]

Our decision in Rhodes v. D & D Enterprises, Inc. is illustrative.[7] In that case, certain vendors brought a declaratory action, asking the court to construe a provision in a contract for the sale of real property.[8] The trial court issued a Decree construing the provision and terminating the contract.[9] It also issued a "Final Judgment" ordering conveyance of the land.[10] In doing so, it adjudicated all issues save identification of the specific land to be conveyed.[11] We held that, under such circumstance, the Decree and Final Judgment were final even if the land remained unidentified.[12] Although we concluded that the appeal from the

---

[6] Rhodes v. D & D Enterprises, Inc., 16 Wn. App. 175, 177, 554 P.2d 390 (1976).

[7] 16 Wn. App. 175, 554 P.2d 390 (1976).

[8] Id. at 176.

[9] Id. at 176-77.

[10] Id. at 177.

[11] Id. at 178.

[12] Id.

5

Decree was defective for other reasons, we found the documents otherwise appealable.[13]

Here, Mockovak filed his notice of appeal on December 22, 2015, following entry of the November 23, 2015 summary judgment order that disposed of all substantive issues in dispute. Likewise, the notice of appeal also designates the order denying the motion to compel, entered on November 25, 2015. Both orders were entered within 30 days prior to filing of the notice. All that remained for the trial court was to finalize the offer of judgment concerning matters already settled earlier in the litigation. In looking to the substance of the orders appealed, we conclude they are analogous to the decree and final judgment in Rhodes. Thus, we hold they are final and appealable.

## DISCOVERY OF TASK FORCE MEMBER

The United States argues that the trial court correctly denied Mockovak's discovery motion because it lacked authority to compel Carver to testify. We hold that the trial court properly exercised its discretion in doing so.

Discovery decisions are within the trial court's sound discretion.[14] A trial court abuses its discretion when it makes decisions based on untenable grounds or for untenable reasons.[15]

---

[13] Id.

[14] State v. Hutchinson, 135 Wn.2d 863, 882, 959 P.2d 1061 (1998).

[15] State v. Foxhoven, 161 Wn.2d 168, 174, 163 P.3d 786 (2007) (internal citation omitted).

## *Touhy* Regulations

The United States argues first that 5 U.S.C. § 301 provides it with authority to oppose discovery of Carver, a member of its joint task force. We agree.

5 U.S.C. § 301 authorizes each federal department head to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records." The DOJ has prescribed such regulations, included within 28 C.F.R. § 16.

28 C.F.R. § 16.22(a) provides:

> [i]n any federal or state case or matter in which the United States is not a party, no employee . . . of the Department of Justice shall, in response to a demand, produce any material contained in the files of the Department, or disclose any information relating to or based upon material contained in the files of the Department, or disclose any information or produce any material acquired as part of the performance of that person's official duties.

Whenever a DOJ employee receives such a demand, he must immediately notify the local U.S. Attorney.[16] Similarly, the party seeking discovery may make a request to the U.S. Attorney.[17] In both instances, the U.S. Attorney then decides whether the relevant employee will testify.[18]

---

[16] 28 C.F.R. § 16.22(b) (2015).

[17] 28 C.F.R. § 16.22(c).

[18] 28 C.F.R. § 16.22(a); 16.24(b).

7

We review de novo the meaning of statutes.[19]

In <u>United States ex rel. Touhy v. Ragen</u>, the U.S. Supreme Court upheld these regulations, explaining that the "necessity[] of centralizing determination as to whether subpoenas duces tecum will be willingly obeyed or challenged is obvious."[20] The regulations have taken the name of that case and are known as the <u>Touhy</u> regulations. When these regulations apply to bar federal employees from testifying, they "operate as a jurisdictional limitation on the [state court's] authority."[21]

Here, the parties dispute whether the regulations actually apply to Carver and, if so, whether they violate the anti-commandeering principle of the Tenth Amendment.

Turning to the first argument, Mockovak argues that Carver was not an "employee" within the meaning of 5 U.S.C. § 301 or the <u>Touhy</u> regulations. We disagree.

For the purposes of Title 5 of the United States Code, an "employee" is a person appointed to the civil service.[22] The DOJ has informed the court that

---

[19] <u>Dowler v. Clover Park Sch. Dist. No. 400</u>, 172 Wn.2d 471, 482, 258 P.3d 676 (2011).

[20] 340 U.S. 462, 468, 71 S. Ct. 416, 95 L. Ed. 417 (1951).

[21] <u>United States v. Threet</u>, No. 09-20523-05, 2011 WL 5865076, *1 (E.D. Mich. Nov. 22, 2011); see <u>Mayo v. City of Scranton</u>, No. 3:CV-10-0935, 2012 WL 6050551, at *2 (M.D. Pa. Dec. 4, 2012); <u>Hickey v. Columbus Consol. Gov't</u>, No. 4:07-CV-096(CDL), 2008 WL 450561, at *3 n.4 (M.D. Ga. Feb. 15, 2008).

[22] 5 U.S.C. § 2105(a).

neither Carver's designation within the FBI nor within the United States Marshal Service qualify as civil service appointments.[23]

But 5 U.S.C. § 301 reaches further. As noted above, it empowers the DOJ to prescribe more general regulations for departmental administration, including the "distribution and performance of its business" and the "custody, use, and preservation of its records, papers, and property." Thus, we conclude that the DOJ may govern the conduct of those under its supervision who perform its business. 28 C.F.R. § 16 is a permissible expression of this authority.

Further, the statutory definition noted above does not control whether Carver is an employee under the Touhy regulations. Because those regulations are otherwise proper under the statute, they may define their own terms. The definition of "employee" for such purposes rests in 28 C.F.R. § 16.21(b). There, "employees" are "all officers and employees of the United States appointed by, or subject to the supervision, jurisdiction, or control of the Attorney General of the United States, including U.S. Attorneys, U.S. Marshals, U.S. Trustees, and members of the staffs of those officials." As discussed below, Carver is subject to such "supervision, jurisdiction, or control." And regulation of such persons is permissible under 5 U.S.C. § 301. The DOJ's use of the word "employee" to describe such persons does not alter our conclusion.

---

[23] Letter from Michael Shih, Appellate Staff, Civil Div., U.S. Dep't of Justice, to Richard D. Johnson, Court Administrator/Clerk, WA State Court of Appeals – Div. I (Oct. 31, 2016).

Further, the DOJ's use of the word "employee" tracks the common law. Mockovak argues that, under the common law, Carver can only be an employee of the agency that pays his salary. He cites to the Supreme Court's reference to the *American Heritage* dictionary definition of an employee as any "person who works for another in return for financial or other compensation."[24] He thus argues that Carver could only be the employee of the agency paying his salary. This is inconsistent with the law of agency.

As the Third Restatement of Agency explains, "the fact that work is performed gratuitously does not" preclude the formation of an agency relationship.[25] Similarly, the common law allows the employer who pays an employee's salary to loan him to another employer. The Second Restatement of Agency explains that a "servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services."[26] Thus, employment by one entity does not preclude simultaneous employment by another entity.

The Supreme Court concluded likewise in <u>N.L.R.B. v. Town & Country Electric, Inc.</u>[27] The issue in that case was whether certain electricians who

---

[24] <u>N.L.R.B. v. Town & Country Elec., Inc.</u>, 516 U.S. 85, 90, 116 S. Ct. 450, 133 L. Ed. 2d 371 (1995).

[25] RESTATEMENT (THIRD) OF AGENCY § 7.07(3)(b) (2006).

[26] RESTATEMENT (SECOND) OF AGENCY § 227 (1958).

[27] 516 U.S. 85, 94, 116 S. Ct. 450, 133 L. Ed. 2d 371 (1995).

organized for and were paid by their union could also be employees of the entity hiring them to do electrical work.[28] In holding that they could be, the Court explained that a "person *may* be the servant of two masters . . . *at one time as to one act*, if the service to one does not involve *abandonment* of service to the other."[29] The Court concluded that the electricians' compensated organizing work did not constitute abandonment of their service to the company.[30] While performing the "ordinary tasks during the working day," the electricians were subject to the company's control, "whether or not the union also pays the worker" or if the union and company's "interests or control might *sometimes* differ."[31]

Our supreme court has explained that "the chief, and most decisive, factor" in forming an employment relationship is the "right of control over the work or thing to be done."[32] The Touhy regulations are consistent with this understanding by stating that one is a federal employee if subject to the "supervision, jurisdiction, or control of the Attorney General."[33]

---

[28] Id. at 87-88.

[29] Id. at 94-95.

[30] Id. at 95.

[31] Id.

[32] Hubbard v. Dep't of Labor & Indus., 198 Wash. 354, 359, 88 P.2d 423 (1939).

[33] 28 C.F.R. § 16.21(b).

11

Whether the SPD pays or also employs Carver is not determinative. If the FBI controls his actions while conducting federal investigations, then he is a federal employee and subject to the Touhy regulations.

Carver's "full-time official duties [are] devoted to the investigation of federal crimes for the purpose of federal prosecution." He receives his assignments from the FBI and "is under the day-to-day supervision and control of the FBI." As such, he must adhere to "the investigative and administrative requirements" of the DOJ and FBI. The DOJ and FBI thus control his actions and render him a federal employee under the Touhy regulations, as interpreted in light of the common law. Thus, the trial court correctly determined that the Touhy regulations apply to Carver.

### Tenth Amendment

Turning to Mockovak's second argument, he claims that application of the Touhy regulations to bar the subpoena directed at Carver violates the Tenth Amendment. This is incorrect.

The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[34] The United States Supreme Court has explained that while this language does not prevent the federal government from regulating individual conduct, it bars it from "commandeering" the institutions of

---

[34] U.S. CONST. amend X.

state government for the fulfillment of its own purposes.[35] This principle protects

the system of "dual sovereignty" contemplated by the United States

Constitution.[36] That system, along with the checks and balances within the

federal government, protect the citizen's individual liberty.[37]

We review de novo constitutional issues.[38]

In Printz v. United States, the Supreme Court considered whether this

principle applied to a statute requiring that state police implement federal law.[39]

Congress had passed the Brady Handgun Violence Prevention Act, requiring that

state police officers conduct background checks on individuals seeking to buy

firearms.[40] One such officer, Sheriff Printz, "object[ed] to being pressed into

federal service" and argued that such impressment violated the Tenth

Amendment.[41] The Court agreed, concluding that it would contravene the

---

[35] Printz v. United States, 521 U.S. 898, 902, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997).

[36] Id. at 919.

[37] Id. at 921.

[38] State v. McCuistion, 174 Wn.2d 369, 387, 275 P.3d 1092 (2012).

[39] 521 U.S. 898, 902, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997).

[40] Id. at 902.

[41] Id. at 905.

constitutional system, allowing the United States to "reduc[e]" state officers to mere "puppets of a ventriloquist Congress."[42]

But, as the United States argues in this case, the Tenth Amendment provides "merely that the federal government may not conscript nonconsenting state executive . . . officers to enforce federal laws." It does not bar regulation of consenting state officers.

Printz supports this distinction. That case identified the "critical point here –that Congress could [not] impose these responsibilities *without the consent of the States*."[43] In contrast, the Court recognized the legitimacy of previous statutes which did not "*mandate* those duties, but merely empowered the [United States] to *enter into contracts* with such State . . . officers as *may be designated* for that purpose *by the governor* of any State."[44] Such consensual collaborations were unlikely to provoke the "federal-state conflict[s]" that offended the Tenth Amendment.[45] Within such collaborative arrangements, state officers are neither "impressed," "dragooned," nor made congressional puppets.[46]

---

[42] Id. at 928.

[43] Id. at 910-11.

[44] Id. at 916 (internal citation omitted).

[45] Id. at 919.

[46] Id. at 928-29; see also Lomont v. O'Neill, 285 F.3d 9, 14 (D.C. Cir. 2002) (holding that the Tenth Amendment allows federal regulation of state officers executing a consensual state-federal program).

Here, Mockovak argues that a longstanding principle holds that "state officers [a]re not stripped of their state sovereignty just because they work[] cooperatively with federal agencies." He cites for this proposition the Supreme Court's decision in Randolph v. Donaldson, but that case does not aid his argument.[47]

In Randolph, a state prison held federal inmates based on two congressional statutes passed in 1789.[48] The first recommended that the states legislate to allow their jails to rent out space to the United States to house federal prisoners.[49] The Printz court would later point to such a law as a legitimate example of consensual federal-state cooperation.[50] The second statute authorized the federal Marshals to appoint deputies for whose misfeasance they would bear responsibility.[51] Virginia passed a law allowing the U.S. Marshal to rent space in its jails for federal prisoners, and the U.S. Marshal for Virginia did so.[52]

---

[47] 13 U.S. (9 Cranch) 76, 3 L. Ed. 662 (1815).

[48] Id. at 84-85.

[49] Id.

[50] Printz, 521 U.S. at 909.

[51] Randolph, 13 U.S. at 84-85.

[52] Id.

A federal prisoner then escaped from a Virginia state jail.[53] An unidentified plaintiff sued the U.S. Marshall in vicarious liability for the state jailer's negligence.[54] Thus, the Court had to determine if the state jailer's incidental involvement in the jail sharing scheme made him an agent of the U.S. Marshal.[55] The Court held that it did not and that the mere rental of jail cells did not render the state jailer the Marshal's deputy.[56] The United States had not appointed the state jailer to such a position, and the Marshal had no authority to command or direct the jailer.[57]

Here, in contrast, the FBI and the U.S. Marshal Service appointed Carver to this task force. Neither Carver nor the state jailer in Randolph merely "agreed to assist" the United States. Carver acted pursuant to a consensual joint task force arrangement between the United States, Washington, and the SPD. The state jailer in Randolph never held any federal position and always remained an exclusively state employee working pursuant to a federal-state cooperative arrangement.[58] The only commonality between that case and this case is that

---

[53] Id. at 84.

[54] Id.

[55] Id.

[56] Id. at 86.

[57] Id.

[58] 13 U.S. at 14-15.

both involve legitimate consensual cooperation between the United States and a state body.

Thus, the trial court correctly denied Mockovak's motion to compel Carver's deposition. It lacked authority under the Touhy regulations to compel Carver to testify.

Mockovak's arguments suggest an unwillingness to accept Carver's status as an officer within the FBI and U.S. Marshall Service. He interprets the United States' brief to argue "that whenever a State police officer joins a joint federal/state task force he becomes a Special Federal Officer and ceases to be subject to the laws of Washington State." The United States makes no such claim. Outside DOJ regulations and applicable principles of sovereign immunity, Carver remains subject to Washington law.

Mockovak mounts two other arguments on how the application of the Touhy regulations offends the Tenth Amendment. They are unpersuasive.

First, he argues that 5 U.S.C. § 301 cannot apply to a state law police officer in a criminal proceeding because the "federal government does *not* have a general police power to make criminal laws." Mockovak's legal argument is correct.[59] But the statute and the Touhy regulations are not directed at criminal conduct. They serve, rather, to regulate the *employment* conduct of federal employees and disclosure of evidence.

---

[59] Bond v. United States, 134 S. Ct. 2077, 2086, 189 L. Ed. 2d 1 (2014).

Second, Mockovak argues that the U.S. Attorney inappropriately sought to "overrule the Superior Court's determination that the deponent may have relevant testimony to give." He argues that "[n]o federal official has the power to usurp the judicial power of the state courts by making evidentiary rulings that are binding on state court judges." The Supremacy Clause proves otherwise.

The United States cannot "commandeer" state legislative or executive branches. But the Supremacy Clause provides that "the laws of the United States . . . shall be the supreme law of the land; and the *judges* in every state shall be bound thereby."[60] This provision requires judges to conform to the requirements of federal law.[61]

Discovery to "compel an official of a federal agency to testify contrary to the agency's duly enacted regulations clearly thwarts the purpose and intended effect of the federal regulations."[62] This "plainly violates both the spirit and the letter of the Supremacy Clause."[63] Thus, the Touhy regulations properly limit the discovery sought in this case. The court did not abuse its discretion in denying the motion to compel Carver to testify at a deposition.

---

[60] U.S. CONST. art. 4, cl. 2 (emphasis added).

[61] Testa v. Katt, 330 U.S. 386, 394, 67 S. Ct. 810, 91 L. Ed. 967 (1947).

[62] Boron Oil Co. v. Downie, 873 F.2d 67, 71 (4th Cir. 1989).

[63] Id.

*Sovereign Immunity*

The United States also argues that its sovereign immunity precludes the enforcement of discovery orders directed against federal employees like Carver. We agree.

Division Two of this court has explained that a subpoena directed "against a federal official, acting within the scope of his delegated authority, is an action against the United States, subject to the governmental privilege of sovereign immunity."[64] Unless the United States waives its immunity, "a state court lacks jurisdiction to compel a federal employee to testify in a state court action to which the United States is not a party, concerning information acquired during the course of his or her official duties."[65]

Because Mockovak seeks information from Carver that Carver learned in the course of his duties as a task force member, federal sovereign immunity precluded the state court from enforcing the subpoena.

## PUBLIC RECORDS ACT

Mockovak next argues that even if the trial court cannot require Carver to testify, it has authority to compel production of documents that Carver relied upon in testifying. We disagree.

The Public Records Act (PRA) defines as records within its purview "any writing containing information relating to the conduct of government or the

---

[64] State v. Vance, 184 Wn. App. 902, 916, 339 P.3d 245 (2014), review denied, 182 Wn.2d 1020 (2015).

[65] Id.

performance of any governmental or proprietary function prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics."[66]

We review de novo interpretations of the PRA.[67]

In Concerned Ratepayers Association v. Public Utility District No. 1 of Clark County, Washington, the supreme court explained that a state or local agency "used" a record otherwise possessed or owned by a different person when the record is "(1) employed for; (2) applied to; or (3) made instrumental to a governmental end or purpose."[68] Thus, in that case, the designs for an electrical turbine became a public record when reviewed by state utility employees for implementation.[69]

Here, Mockovak argues that certain task force documents became public records subject to the PRA when Carver used them. While we agree that such documents likely qualify as public records under the state act, that alone does not entitle Mockovak to them.

The United States argues that even if Carver relied upon these documents in his earlier investigation and testimony, "nothing in Concerned Ratepayers suggests that the Public Records Act requires Washington State agencies to

---

[66] RCW 42.56.010(3).

[67] Nissen v. Pierce County, 183 Wn.2d 863, 872, 357 P.3d 45 (2015).

[68] 138 Wn.2d 950, 960, 983 P.2d 635 (1999).

[69] Id. at 962.

acquire and turn over documents created by and belonging to a federal agency in contravention of that agency's Touhy regulations." We agree.

## WORK PRODUCT

The County and the KCPA argue that the trial court properly granted summary judgment dismissing Mockovak's challenge to the redaction of the 81 challenged documents as protected work product. We agree.

The PRA exempts from disclosure "records [that] would not be available to another party under the rules of pretrial discovery for causes pending in the superior courts."[70] CR 26(b)(4) establishes two tiers of work product protection. First, an attorney's documented "mental impressions, conclusions, opinions, or legal theories" are always immune from discovery.[71] Second, other documents "prepared in anticipation of litigation or for trial by or for another party" are not exempt for disclosure when the party seeking disclosure demonstrates a substantial need for them and an inability without undue hardship to procure their equivalent by other means.[72]

We review de novo summary judgment orders.[73] Summary judgment is proper "only when there is no genuine issue as to any material fact and the

---

[70] RCW 42.56.290.

[71] CR 26(b)(4).

[72] Id.

[73] Neigh. Alliance of Spokane County v. County of Spokane, 172 Wn.2d 702, 715, 261 P.3d 119 (2011).

moving party is entitled to judgment as a matter of law."[74] "A genuine issue of material fact exists if 'reasonable minds could differ on the facts controlling the outcome of the litigation.'"[75] This court considers "the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party."[76]

Mockovak advances numerous challenges to the trial court's conclusion on summary judgment that the documents at issue were protected from disclosure as work product. He argues first that he is entitled to documents within Appendix A because attorney work product protection was allegedly overridden by criminal discovery requirements under Brady v. Maryland.[77] He argues second that the KCPA waived the protections of the work product doctrine to documents within Appendix B. He argues third that the work product doctrine does not apply to documents within Appendix C because they were prepared by the USAO and thus not prepared in anticipation of litigation. He argues lastly that even if the work product doctrine protects these documents, he

---

[74] Scrivener v. Clark Coll., 181 Wn.2d 439, 444, 334 P.3d 541 (2014); see also CR 56(c).

[75] Knight v. Dep't of Labor & Indus., 181 Wn. App. 788, 795, 321 P.3d 1275 (quoting Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008)), review denied, 181 Wn.2d 1023 (2014).

[76] Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015).

[77] 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

has made a sufficient showing to overcome its protection. We disagree with all of these arguments.

### Brady Rights

Mockovak argues the County and KCPA must disclose unredacted versions of documents in his Appendix A because he is constitutionally entitled to these documents under Brady. We disagree.

The Supreme Court held in Brady that the "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[78] Such evidence includes evidence that may be used to impeach a witness's credibility.[79]

Federal Circuit Courts of Appeals have concluded that Brady obligations extend to evidence suggesting an implied or "tacit understanding[s]" between the government and witnesses to exchange cooperation for some benefit.[80] The government must provide such evidence whether or not the defense requests it.[81]

---

[78] Id. at 87.

[79] Giglio v. United States, 405 U.S. 150, 153-54, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

[80] Wisehart v. Davis, 408 F.3d 321, 323-24 (7th Cir. 2005); see also Douglas v. Workman, 560 F.3d 1156, 1186 (10th Cir. 2009).

[81] Kyles v. Whitley, 514 U.S. 419, 433, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

We review de novo constitutional issues.[82]

Here, Mockovak argues that Brady requires disclosure of any document showing a tacit understanding between the KCPA or USAO and Kultin to assist Kultin in his immigration application. He argues that the trial court erred in rejecting this argument because it balanced his interest in securing Brady material against the County and the KCPA's interests in protecting their work product. Instead, he argues that Brady rights should always trump work product protection.

We agree that a balancing test is inapplicable to this case. Nevertheless, Mockovak cannot raise his Brady claims in this case.

In concluding that the PRA required such a balancing test, the trial court relied upon the D.C. Circuit Court of Appeals' decision in Roth v. United States Department of Justice.[83] In that case, the D.C. Circuit Court of Appeals considered Lester Bower's Freedom of Information Act (FOIA) suit for evidence he argued to be exculpatory.[84] The United States argued that such evidence was protected from disclosure under a privacy exemption specific to the FOIA.[85]

---

[82] McCuistion, 174 Wn.2d at 387.

[83] 642 F.3d 1161 (D.C. Cir. 2011).

[84] Id. at 1166-68.

[85] Id.

Analysis of that exemption required the court to balance the public's interest in disclosure against the privacy interests at stake.[86]

But this court held that approach to be improper in considering PRA challenges in King County v. Sheehan.[87] William Sheehan was a critic of law enforcement and had made public records requests for the names, job titles, and pay scales of every police officer employed by King County.[88] The County sued and moved to enjoin Sheehan from investigating these records.[89] The trial court granted the County's motion, in part, after balancing the interests of disclosure against the County's in effective law enforcement.[90]

This court found that balance inappropriate.[91] While that analysis was proper in the federal courts' consideration of FOIA's privacy exemption, the PRA was "more severe."[92] It required that the agency resisting disclosure show both a privacy interest and a lack of legitimate public interest.[93] As such, "the use of a

---

[86] Id. at 1174.

[87] 114 Wn. App. 325, 57 P.3d 307 (2002).

[88] Id. at 331.

[89] Id.

[90] Id. at 334.

[91] Id. at 344.

[92] Id.

[93] Id. at 342.

test that balances the individual's privacy interest against the interest of the public in disclosure is not permitted."[94]

The controlling rule here is that a litigant may only assert his Brady rights in an appeal of or collateral attack on a criminal conviction.[95] Numerous federal courts have held that Brady claims are "proper only in connection with a criminal proceeding," not a suit for the disclosure of public records.[96] The Supreme Court has instructed that Brady is "the wrong framework" for evaluating the government's post-trial disclosure obligations.[97] Similarly, Roth held that a public records request is "not a substitute" for a proper Brady request in a criminal case.[98]

Mockovak argues that Roth held differently. He argues that the D.C. Circuit Court of Appeals ordered disclosure of the documents Bower sought under Brady. This is incorrect. As stated, the Roth court balanced the public interests at stake against the United States' interest in withholding documents. In arguing for the public's interests, Bower argued that the public had an "interest in knowing whether the federal government complied with its Brady obligation," so

---

[94] Id. at 344.

[95] Roth, 642 F.3d at 1177.

[96] Stimac v. U.S. Dep't of Justice, 620 F. Supp. 212, 213 (D.D.C. 1985); accord Roth, 642 F.3d at 1176.

[97] Dist. Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 69, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009).

[98] Roth, 642 F.3d at 1177.

as to prevent unfair convictions.[99] He did not argue he had a constitutional due process right to the documents.

Noting this distinction, the D.C. Circuit explained that while Bower "certainly has an intense personal interest in obtaining whatever information might bolster the Brady claims he is presenting in his collateral attacks on his conviction, [his] personal stake in the release of the requested information is 'irrelevant' to the balancing of public and third-party interest required."[100] The court ultimately concluded that the public interests at stake outweighed the government's interest, not that Bower was entitled to disclosure under Brady.[101]

Here, Mockovak attempts to raise Brady claims in a PRA action. He cannot do so. As the County correctly explains, "[t]his is not to say that the PRA trumps or otherwise limits what Brady allows. It simply means that the issue must be litigated in the proper forum."

*Work Product Waiver*

Mockovak argues that the County waived the work product protection attached to communications made to the U.S. Attorney in his Appendix B documents. We disagree.

---

[99] Id. at 1175.

[100] Id. at 1177.

[101] Id. at 1181.

Waiver occurs when "a party discloses documents to other persons with the intention that an adversary can see the documents."[102] Thus, mere disclosure is insufficient if the party who allegedly waived the protection did not do so in a way that would disclose the documents to an adverse party.

We review de novo evidentiary issues underlying a summary judgment order.[103]

Relatedly, the County and the KCPA claim that the "common interest" rule protects communications to the U.S. Attorney. Under this rule, "communications exchanged between multiple parties engaged in a common defense remain privileged" and do not lose their protection by waiver.[104]

Mockovak argues this rule is not met because the KCPA and the USAO frequently came to tension over what evidence to disclose in the original prosecution. Tensions alone do not waive the protection.

Aligned counsel, even counsel within the same office may disagree. Such tension may be greater when counsel must function under different governmental systems. This tension does not preclude counsel from sharing common investigative and prosecutorial interests. The United States did not lose those shared interests because it chose to assist the State in prosecuting Mockovak rather than bring charges itself.

---

[102] Harris v. Drake, 152 Wn.2d 480, 495, 99 P.3d 872 (2004).

[103] Neigh. Alliance of Spokane County, 172 Wn.2d at 715.

[104] C.J.C. v. Corp. of Catholic Bishop of Yakima, 138 Wn.2d 699, 716, 985 P.2d 262 (1999).

Mockovak responds by citing a recent case from Division Three where the court concluded that multiple agencies cooperating in joint litigation satisfied the common interest rule.[105] But that case never limited the rule to such contexts. Mockovak provides no authority for the argument that two parties cannot share a common interest when only one ultimately litigates the matter. As such, his argument is unpersuasive.[106]

Mockovak also argues that the County waived work product protection in documents 100, 109, 110, and 111 by disclosing them to Kultin.

The County and the KCPA point to the Third Circuit Court of Appeals' persuasive opinion in Sporck v. Peil as authority for the proposition that disclosure to a friendly witness does not constitute waiver.[107] In that case, shareholders brought a securities fraud class action against National Semiconductor Corporation.[108] Class representatives deposed Charles Sporck, President of the company.[109] In preparation for his deposition, Sporck's counsel

---

[105] Kittitas County v. Allphin, 195 Wn. App. 355, 368, 381 P.3d 1202 (2016).

[106] See Darkenwald v. Emp't Sec. Dep't, 183 Wn.2d 237, 248, 350 P.3d 647 (2015).

[107] 759 F.2d 312 (3d Cir. 1985).

[108] Id. at 313.

[109] Id.

prepared him by showing him numerous documents, already produced to the class representatives.[110]

At the deposition, Sporck referred to the documents.[111] Class attorneys then asked if he had examined any documents in preparation for the deposition.[112] When he answered in the affirmative, the class attorneys moved for defense counsel to identify and produce them.[113] Defense counsel refused to identify them, explaining that defense counsel had already produced the documents and that the selection of documents was itself protected work product.[114] The trial court granted the class's motion, and Sporck petitioned for a writ of mandamus to order non-disclosure.[115]

While the Third Circuit Court of Appeals declined to grant that writ, it directed the trial court to order the document selection protected as work product, even after disclosure to a witness.[116] In doing so, it concluded that defense

---

[110] Id.

[111] Id. at 314.

[112] Id.

[113] Id.

[114] Id.

[115] Id.

[116] Id. at 318-19.

counsel's presentation to Sporck of the documents, so selected, was a "proper and necessary preparation of his client's case."[117]

Here, Mockovak points to two cases in response in order to support his argument. He first cites State v. Garcia, where this court considered whether a prosecutor's notes of a witness interview, absent the prosecutor's "opinions, theories or conclusions" constituted protected work product.[118] This court determined that the notes did not.[119] Thus, this court never had the opportunity to consider waiver of protection for actual work product disclosed to a witness.

Mockovak also points to S.E.C. v. Gupta in the District Court for the Southern District of New York.[120] In that case, Rajat Gupta, the defendant in a securities civil enforcement action, deposed Lloyd Blankfein, C.E.O. of Goldman Sachs.[121] Gupta's counsel asked Blankfein if he had met with anyone aside from his own attorneys in preparation for the deposition.[122] Blankfein responded that he had met with attorneys from the USAO and the Securities and Exchange

---

[117] Id. at 316.

[118] 45 Wn. App. 132, 138, 724 P.2d 412 (1986).

[119] Id.

[120] 281 F.R.D. 169 (S.D.N.Y. 2012).

[121] Id. at 170.

[122] Id.

Commission (SEC).[123] Counsel asked him if those attorneys had shown him any documents at those meetings, to which the SEC objected, claiming that such documents were protected work product.[124]

Gupta moved to compel production of those documents.[125] The court granted that motion, concluding that the SEC and USAO had waived the documents' work product protection.[126] But it did so because those agencies shared no common interest with Blankfein.[127] Blankfein was represented by his own attorneys and took no position in the civil enforcement action.[128]

Here, by contrast, Kultin participated not only in the prosecution of Mockovak but in the earlier investigation. The investigation began with his call to the FBI.[129] As such, he certainly took a position in this case, sharing a common interest in seeing Mockovak tried for his crimes. Thus, Mockovak cannot demonstrate a genuine issue of material fact whether the United States, the

---

[123] Id.

[124] Id. at 170-71.

[125] Id. at 171.

[126] Id. at 173.

[127] Id. at 172.

[128] Id.

[129] In re Mockovak, No. 69390-5-I, slip op. at *2.

County, or the KCPA waived work product protection by disclosing documents to Kultin related to their common interest with Kultin.

*Anticipation of Litigation*

Mockovak argues that the documents within his Appendix C are not protected work product because federal attorneys prepared them and could not have done so in anticipation of litigation because the United States did not ultimately prosecute Mockovak. We disagree.

In Dever v. Fowler, this court concluded that the "protection under the work product doctrine extends to documents prepared in anticipation of *any* litigation, regardless of whether the party from whom it is requested is a party in the present litigation."[130] In that case, the State had earlier charged George Dever with arson.[131] After the earlier trial court dismissed that charge, Dever sued the investigating fire department and its investigator.[132]

In the course of litigation, Dever demanded disclosure of certain documents prepared by his earlier prosecutor.[133] The King County prosecutor, not party to the suit, claimed that the sought after documents were protected work product.[134] Dever rebutted that work product protection did not apply to

---

[130] 63 Wn. App. 35, 47, 816 P.2d 1237 (1991).

[131] Id. at 38.

[132] Id. at 39.

[133] Id. at 46.

[134] Id.

documents prepared by non-party witnesses.[135] This court rejected that argument and concluded that the documents prepared in anticipation of litigation may be protected even when the preparer is not a party to the present litigation.[136]

Relatedly, our supreme court has held that a party may effectively claim work product protection on behalf of a non-party.[137]

In this case, the USAO prepared the documents within Appendix C in anticipation of prosecuting Mockovak. That it ultimately agreed with the KCPA that the State should prosecute is irrelevant. The rule in Dever allows the protection of these documents as work product.

Nonetheless, Mockovak argues that neither the United States nor the County ever provided affirmative evidence that the e-mails were prepared in anticipation of litigation. This argument is unpersuasive. The e-mails speak for themselves as all concern an ongoing criminal investigation with the intent to seek prosecution. Thus, Mockovak cannot demonstrate a genuine issue of material fact whether the United States attorneys prepared the documents without anticipation of litigation.

---

[135] Id.

[136] Id. at 47.

[137] Harris, 152 Wn.2d at 492.

*Overcoming Work Product Protection*

Whether or not the County or the KCPA waived the work product protection in this case, Mockovak argues that he has overcome that protection by demonstrating a substantial need for disclosure and an undue hardship in acquiring the documents by other means. We again disagree.

As discussed above, there are two tiers of work product protection.[138] First, an attorney's documented "mental impressions, conclusions, opinions, or legal theories" are always immune from discovery.[139] Second, other documents "prepared in anticipation of litigation or for trial by or for another party" are not exempt from disclosure when the party seeking disclosure demonstrates a substantial need for them and an inability without undue hardship to procure their equivalent by other means.[140]

The County and the KCPA argue that the documents are "opinion" product. We agree.

As the County and the KCPA state, the document redactions "consist of attorney perceptions and analysis relating to case preparations and plans, evidence, witnesses and strategy in Mockovak's criminal trial." Based on our careful review of the unredacted and sealed documents in the record on appeal, this characterization is accurate. Such content represents the "mental

---

[138] CR 26(b)(4).

[139] Id.

[140] Id.

35

impressions, conclusions, opinions, or legal theories" of the drafting attorneys.[141] Such work product is always immune from disclosure.[142] As such, these documents are absolutely immune from disclosure.

Even if the documents are only regular work product, the documents are protected from disclosure unless Mockovak can show a "substantial need" for them and an inability to procure them otherwise without "undue hardship."[143]

"'Substantial need' in the litigation context means that the information is vital to the preparation of the party's case."[144] But a party does not demonstrate substantial need "simply because he does not have them."[145]

The County and the KCPA do not contest that Mockovak would face an undue hardship in seeking to acquire the documents through other means. Rather, the County and the KCPA argue that the documents at issue contain no information about Kultin's immigration status that Mockovak did not know already. Specifically, they highlight five factual matters for which Mockovak seeks evidence. First, Kultin was a lawful permanent resident at the time of trial rather than a U.S. citizen. Second, Kultin was in the United States on asylum

---

[141] Id.

[142] Id.

[143] Id.

[144] Soter v. Cowles Publ'g Co., 131 Wn. App. 882, 899, 130 P.3d 840 (2006).

[145] Kleven v. King County Prosecutor, 112 Wn. App. 18, 25, 53 P.3d 516 (2002).

status. Third, the Immigration and Naturalization Service (INS) arrested Kultin in 1997. Fourth, the United States never offered Kultin immigration assistance for his help as an informant and witness. Fifth, Kultin had an application for citizenship pending at the time of trial.

The record shows that the State provided evidence of the first three facts to Mockovak. On October 28, 2010, the State forwarded an e-mail between the KCPA and Carver indicating that Kultin was a lawful permanent resident at that time. The same e-mail indicated his asylum status. The KCPA also provided an FBI report to Mockovak during criminal discovery that indicated that Kultin had been "once arrested by [an] immigration official[] who believed [that] his immigrant paperwork was not in order. However, it was discovered that his papers were in order and the case was dismissed." Thus, Mockovak cannot show substantial need for documents evidencing these facts. Only the questions of when Kultin filed for citizenship and whether he received immigration assistance from the United States or the County remain at issue.

On May 26, 2010, the State provided documentation to Mockovak showing that Kultin had an immigration application pending in April 2009. Later, during this case, Kultin testified by deposition that he filed for citizenship again during 2011. Mockovak points to the crucial gap between the two dates and argues that the State never informed him whether Kultin had a citizenship application pending at the time of the criminal trial.

But Mockovak's theories on the nature of that gap are all speculative. He speculates that Kultin may have intended to file a new application after trial,

capitalizing on the assistance he rendered the FBI and State. He also speculates that the 2009 application may have remained pending during trial or been denied before. He further speculates that Kultin may have lied in the deposition and that the County, the KCPA, or the United States might have known it. His theories all fail because they do not suggest that the County, the KCPA, or United States have any information beyond what they provided.

Regarding the possibility that Kultin obtained assistance from the DOJ or King County, the County and the KCPA argue that they already gave Mockovak complete information about any potential immigration assistance offered to Kultin. Specifically, they point to Carver's declaration of December 3, 2010 and a letter from the KCPA to defense counsel on May 10, 2010. Carver and the author of the letter averred that Kultin did not receive any promise of immigration assistance for his testimony. The County and the KCPA also highlighted Kultin's testimony that he had participated in the investigation to do the right thing. Again, Mockovak can only speculate that these statements were disingenuous but his speculation falls below the substantial need he must demonstrate.

Mockovak also argues that the County must disclose documents 26, 77, and 99 in full. The County concedes that these documents involve "immigration-related fact[s] concerning Kultin." Mockovak speculates that they may detail some immigration assistance offered by the United States. The documents contain no such information but only incidental facts already disclosed to Mockovak well before the criminal trial. As such, he cannot show substantial need for them because they are not vital to his case.

Mockovak argues in reply that two federal cases show that he has demonstrated substantial need. Neither are persuasive in this case.

The first, Benn v. Lambert,[146] is inapposite to this case. There, the Ninth Circuit Court of Appeals considered whether a habeas corpus petitioner made a sufficient showing of substantial need to overcome work product protections of documents he was entitled to under Brady.[147] But as discussed earlier, Brady claims are only applicable in such a collateral attack on a conviction or in the direct appeal itself. This case is thus irrelevant to the court's determination here because this is a PRA action, the improper forum for Brady claims.

In the second case, Doubleday v. Ruh, county sheriffs arrested Allison Doubleday for assault of a police officer, but a state trial court found her not guilty.[148] She then brought a 42 U.S.C. § 1983 challenge and sought the prosecutor's file on her criminal case.[149] The defendant sheriff's officers refused, asserting that the documents were protected work product.[150] The District Court for the Eastern District of California concluded otherwise, holding that the documents were not work product for reasons not relevant here.[151] But it

---

[146] 283 F.3d 1040 (9th Cir. 2002).

[147] Id. at 1054.

[148] 149 F.R.D. 601, 604 (E.D. Cal. 1993).

[149] Id.

[150] Id.

[151] Id. at 605.

considered in arguendo whether Doubleday could show substantial need to overcome the work product protection if it applied.[152] It held that she could show sufficiently substantial need to justify disclosure of witness statements contemporaneous with her arrest.[153]

Here, in contrast, Mockovak does not seek witness statements but rather communications between attorneys. Even the documents for which he argues the KCPA waived work product protection by disclosing to Kultin come from the attorneys, not the witnesses. As such, Doubleday is neither analogous nor persuasive. Mockovak still cannot show a genuine issue of material fact showing he has substantial need for the documents.

## NCIC REPORT

Mockovak argues that the County and the KCPA improperly withheld Kultin's NCIC report and that the County and the KCPA waived any protection of the report when Carver summarized the information he learned from the report. We disagree.

The PRA permits agencies to not disclose records when "[an]other statute . . . exempts or prohibits disclosure."[154] The County and the KCPA argue that 28 U.S.C. § 534 satisfies this exemption. That statute governs the DOJ's acquisition, preservation, and exchange of criminal identification records with

---

[152] Id. at 607-08.

[153] Id.

[154] RCW 42.56.070(1).

other federal, state, tribal, and municipal agencies.[155] Pursuant to subsection (b) of that statute, such exchange "is subject to cancellation if dissemination is made outside the receiving departments or related agencies."

Here, Mockovak argues that Carver waived the "other statute" exemption when he testified in his declaration that he had learned certain information from the report. But, a federal statutory bar on disclosure cannot be waived.[156]

Two FOIA cases are instructive. In the first, Dow Jones & Co. v. United States Department of Justice, the District Court for the Southern District of New York explained that "[v]oluntary disclosures of all or part of a document may waive an otherwise valid FOIA exemption."[157] But it also explained that the party seeking that document must show that "the withheld information has already been *specifically* revealed to the public and that it appears to *duplicate* that being withheld."[158] As a result, "neither general discussions of topics nor partial disclosures of information constitute waiver of an otherwise valid FOIA exemption."[159]

In that case, the plaintiffs, as owners of the Wall Street Journal, sought disclosure of an FBI investigation report pertaining to the alleged suicide of a

---

[155] 28 U.S.C. § 534 (2011).

[156] S.E.C. v. Yorkville Advisors LLC, 300 F.R.D. 152, 167 (S.D.N.Y. 2014).

[157] 880 F. Supp. 145, 150-51 (S.D.N.Y. 1995).

[158] Id. at 151.

[159] Id.

White House counsel.[160] They argued that the government had waived the exemption when the Deputy Attorney General disclosed certain basic information about the scene of the suicide and the preliminary investigation.[161] Such preliminary information included initial conclusions as to the nature of death and the presence of certain evidence at the scene of the crime.[162] It also included the counsel's recent mental health history.[163] Yet the court held this "limited, general, and cursory discussion[]" to be insufficient to waive the FOIA exemption.[164]

Mockovak also cites, without avail, New York Times Co. v. United States Department of Justice to support his argument. In that case, the New York Times sought disclosure under the FOIA of a memorandum drafted by the DOJ and Department of Defense justifying the Obama Administration's use of drone strikes.[165] The Second Circuit Court of Appeals held that the DOJ had waived the FOIA exemption for attorney-client privilege when it released a 16 page white paper that shared "substantial overlap" with the memorandum, largely

---

[160] Id. at 146.

[161] Id. at 147, 150-51.

[162] Id. at 147.

[163] Id.

[164] Id. at 151.

[165] 756 F.3d 100 (2d Cir. 2014).

"parallel[ing]" the longer document's legal analysis.[166] Such a disclosure mirrored the specific disclosure that duplicates the withheld document contemplated in Dow Jones & Co.

Washington law is consistent with these cases. In Soter v. Cowles Publishing Co., Division Three of this court concluded that while "[d]ocuments released to a civil litigation adversary may lose their [work product and attorney-client] privileged status[,] disclosing facts contained in privileged documents (in interrogatories, for instance) does not mean the other party gets the document itself."[167] That case concerned a newspaper's PRA suit for records of a school district investigation of a student's death.[168] The District had released certain information to the public and the deceased child's family.[169] The newspaper argued that in doing so, the District waived the privilege in the reports.[170] The court held that while they might have waived privilege as to the disclosed information, the documents themselves remains protected.[171]

Here, by contrast, Carver merely declared that he was "familiar with Kultin's criminal and arrest history report, which reflects only one arrest. That

---

[166] Id. at 116.

[167] 131 Wn. App. 882, 907, 130 P.3d 840 (2006).

[168] Id. at 889.

[169] Id.

[170] Id. at 906.

[171] Id.

arrest was on January 17, 1997, by U.S. Customs, Immigration and Naturalization (INS) Service. Kultin has no known criminal convictions."

This information is limited, general, and cursory. Aside from the date and arresting agency, it provides no further specifying information such as location, crime charged, or disposition. In no way does it resemble the substantial overlap found in New York Times Co. As such, this disclosure was not sufficient to waive the protections of the PRA's "other statute" exemption and 28 U.S.C. § 534.

## ATTORNEY FEES

Mockovak argues that he is entitled to fees pursuant CR 37(a)(4) and RCW 42.56.550(4). We deny his request.

CR 37(a)(4) entitles a prevailing party in a discovery dispute to the reasonable expenses incurred in obtaining that order, including attorney fees. RCW 42.56.550(4) permits the prevailing party in a PRA dispute to receive reasonable attorney fees incurred in litigating the dispute. "[W]here a prevailing party is entitled to attorney fees below, they are entitled to attorney fees if they prevail on appeal."[172]

As discussed, Mockovak does not prevail in either his discovery dispute or the merits of his PRA claim. Thus, an award to him of reasonable attorney fees is unwarranted under either CR 37(a)(4) or RCW 42.56.550(4).

---

[172] Sharbono v. Universal Underwriters Ins. Co., 139 Wn. App. 383, 423, 161 P.3d 406 (2007).

We affirm the summary judgment order and the order denying the motion to compel discovery. We deny Mockovak's request for an award of reasonable attorney fees.

Cox, J.

WE CONCUR:

Spearman, J.

Leach, J.